ARGALIS P. BUTLER *vs.* CITY OF WORCESTER.

The powers, as to certain brooks therein named, conferred upon the city council of Worcester by St. 1867, c. 106, § 2, extend to all such portions of those brooks as are within the city.

The St. 1867, c. 106, providing for a system of sewerage in the city of Worcester is constitutional.

The St. 1867, c. 106, § 1, authorizes the city council of Worcester to "lay, make and maintain in said city all such drains and common sewers as they shall adjudge to be for the public health and convenience;" § 2 authorizes them "to fix the boundaries of Mill Brook," "and alter, change, widen, straighten and deepen" its channel, and cover, pave and inclose it in retaining walls "for the purposes of sewerage;" § 4 provides that "every person owning real estate upon any street in which any drain may be laid,"

" or whose estate may be benefited thereby, shall pay to said city such sum as the mayor and aldermen shall assess upon him as his proportionate share of the expenditure " " for drains and sewers." The city council appropriated and laid out continuous portions of Mill Brook as a main drain and common sewer, and changed its course, cleared it out, deepened and paved its channel, walled it in, and covered it with a continuous arch for a portion of its length, and built bridges over the remaining portion at the street crossings: *Held,* that these acts were within the authority conferred by § 2; and that the cost thereof, together with cost of constructing drains and sewers in the neighboring streets under § 1, might be included in the expenditure of the city for drains and sewers, and assessed upon the owners of real estate under § 4.

By St. 1867, *c.* 106, which provides for a system of sewerage in the city of Worcester, the estates upon any street in which a drain or sewer has been laid under the act and the estates upon the line of the drain or sewer and the estates which are benefited thereby, may be assessed a proportionate share of the whole expenditure of the city for drains and sewers under the act.

Under St. 1867, *c.* 106, providing for a system of sewerage in the city of Worcester, one who has entered his private drain into a common sewer constructed under that act is liable to be assessed for his proportion of the whole expenditure of the city under the act, and cannot object that he had no previous notice of the laying out of the sewers.

Under the St. 1867, *c.* 106, providing for a system of sewerage in the city of Worcester, parties liable to assessment for a portion of the cost are not entitled to previous notice and a hearing upon the question of the amount of the assessment; their remedy, if dissatisfied, is by an application for an abatement, or by an appeal to a jury under § 4 of the act.

An assessment under St. 1867, *c.* 106, providing for a system of sewerage for the city of Worcester, made upon a person whose estate is benefited, cannot be invalidated in an action to recover back an assessment paid, upon the ground that the assessment included estates not liable, and omitted estates liable ; if the assessment is in this respect erroneous, it must be revised on *certiorari.*

Under St. 1867, *c.* 106, providing for a system of sewerage for the city of Worcester, and empowering the mayor and aldermen to assess, upon persons whose estates are benefited, their proportionate share of the expenditure, an assessment made cannot be invalidated in an action to recover back an assessment paid, upon the ground that the assessment is not proportional because the estates benefited were divided into classes according to their value per foot, and the different classes assessed at a different per cent., the variation not being sufficient in amount to show that the entire scheme of assessment was unreasonable, or that it operated unjustly upon the plaintiff.

The right, under St. 1867, *c.* 106, (providing for a system of sewerage for the city of Worcester,) to lay assessments upon estates benefited, is not affected by the exercise by the city council of the power to issue scrip under § 5 of that act.

CONTRACT to recover back an assessment of $56.25 made by the mayor and aldermen of the city of Worcester, under St. 1867, *c.* 106,* upon the plaintiff's estate on Gold Street in that city, and

---

* " SECTION 1. The city council of the city of Worcester may lay, make and maintain in said city all such drains and common sewers as they shall adjudge to be for the public health or convenience, and may repair the same, from time to time, whenever necessary; and the said city and the citizens

paid by him under protest after due proceedings taken to enforce payment thereof by levy and sale of the estate.

---

thereof, shall have the same rights, and be subject to the same liabilities, as if the same had been laid, made or maintained under the provisions of chapter forty-eight of the General Statutes, except as hereinafter provided.

"Section 2. The city council of said city may fix the boundaries of Mill Brook, Lincoln Brook, Austin Street Brook, Hermitage Brook, Piedmont Brook, and Pine Meadow Brook, with their tributaries; said brooks being so named as aforesaid, and described in a report to the city council of said city by the committee on sewerage, on the second day of October in the year eighteen hundred and sixty-six, and also in a plan prepared by A. C. Buttrick, copies of which report and plan are herewith presented to be filed with this act in the office of the secretary of the Commonwealth; and said city council may alter, change, widen, straighten and deepen the channels of said brooks, and remove obstructions therefrom, and may use and appropriate said brooks, cover them, pave and inclose them in retaining walls, so far as they shall adjudge necessary for purposes of sewerage, drainage and the public health.

"Section 3. The city council of said city may take and hold by purchase or otherwise, such land, water rights, dams or other real estate, and so use, alter or remove the same, as they shall adjudge necessary for the purposes aforesaid. And if any person shall sustain damages to his property by reason thereof, and shall fail to agree upon a settlement of the same with said city council, the same shall be assessed in the same manner and upon the same principles as damages are assessed in the laying out of highways.

"Section 4. Every person owning real estate upon any street in which any drain or sewer may be laid under or by virtue of this act, and upon the line thereof, or whose real estate may be benefited thereby, shall pay to said city such sum as the mayor and aldermen shall assess upon him as his proportionate share of the expenditure of the city for drains and sewers; and the sum so assessed upon him shall constitute a lien upon said real estate for two years after it is assessed; and if not paid within ninety days after notice of said assessment served upon the owner of said land, or his agent, may be levied by a sale of said real estate, to be conducted in the same manner as a sale of real estate for the non-payment of taxes. And any person aggrieved by the doings of the mayor and aldermen under this section may, at any time within three months from receiving notice of any assessment, apply for a jury in the manner provided in the sixth section of the forty-eighth chapter of the General Statutes.

"Section 5. For the purpose of defraying the expenses and outlays incurred for the purposes aforesaid, or so much thereof as they shall see fit, the city council of the city of Worcester are hereby authorized to issue, from time

In the Superior Court the case was submitted upon an agreed statement of facts, the material portions of which were as follows:

The act of 1867, *c.* 106, was duly accepted by the voters of the city, April 16, 1867.

March 11, 1867, the joint standing committee of the city council on sewers, to whom had been referred that portion of the mayor's address relating to the sewerage of the city, and the petitions of sundry citizens praying that Fox's dam be removed, and that Mill Brook be made available for drainage purposes, made a report, and in pursuance of the recommendations contained in the report, an order was passed at the same meeting, authorizing the committee to effect the purchase of the water rights and privileges at Fox's mill, and to arrange with Messenger & Wright for the transfer of their rights as lessees of the property, and authorizing the treasurer to issue the notes or bonds of the city payable in ten years, in payment therefor, the assessment to be charged to the expenditure for sewers.  On the 20th of April, 1867, the committee purchased of the owners of Fox's mill, the right to take down and remove the dam, and to locate and construct a sewer through the estate and to turn the waters of the stream through the sewer, and the bonds of the city to the amount of $36,000, payable in ten years, were issued to the owners in payment for these rights, and the amount was charged to the expenditure for sewers.

December 30, 1867, the city council passed an order by which they adjudged it necessary for the purposes of sewerage, drainage and the public health, to fix the boundaries of that portion of Mill Brook between the northerly line of Green Street and the

to time, scrip, notes, bonds or certificates of debt, to be denominated on the face thereof ' Sewer Scrip of the City of Worcester,' to an amount not exceeding two hundred thousand dollars, and redeemable in not less than ten years from and after the date thereof.

" SECTION 6. This act shall be void unless submitted to the voters of said city of Worcester, and approved by a majority of those voting at ward meetings held simultaneously, in said city in the several wards, within one year from the passage of this act, which meetings shall be called in the same manner as other legal meetings of said wards, and for the purpose of voting upon the approval of this act, either solely or with other legal purposes."

southerly line of Front Street, to straighten, deepen and pave the channel of the brook between these points, and to inclose it in retaining walls, and to appropriate, establish and lay it out as a main drain and common sewer; and they located it by metes and bounds, and adjudged that this section of the brook be established and laid out as a main drain and common sewer, and suitably paved and inclosed in retaining walls.    The location of this part of the sewer runs through the Fox mill-pond and dam, and by its subsequent construction as laid out, the pond, dam and water privilege were destroyed.

June 28, 1869, the city council passed an order by which they adjudged it necessary for the purposes of sewerage, drainage and the public health, that the location of Mill Brook between the northerly line of Green Street and the northerly line of Cambridge Street be changed from its present circuitous location ; that it be located parallel with Millbury Street between said points; that the new channel be excavated, paved, walled and inclosed by an arch or retaining walls, at such times thereafter as the city council might adjudge it fit and proper; and adjudged that the same be appropriated, established and laid out to be hereafter constructed and maintained as a main drain and common sewer, and located the same by metes and bounds.

July 12, 1869, the city council passed a similar order with respect to that portion of Mill Brook between Front Street and Exchange Street; February 28, 1870, they passed a similar order with respect to that portion of the brook between Exchange Street and a point near Court Mills ; and April 3, 1871, they passed a similar order with respect to that portion of the brook between the point near Court Mills and a point north of Lincoln Square.    By these orders the several sections were in terms laid out as main drains and common sewers.

April 3, 1871, the city council passed an order authorizing the joint standing committee on sewers to cause to be prepared all the necessary plans and specifications, advertise for proposals, and make all the necessary contracts for excavating and walling up that portion of the Mill Brook extending from Green Street to Cambridge Street, over the new location of June 28, 1869, and to

build bridges over the brook at the crossing of each of the streets over the new location. February 3, 1868, the city council passed an order by which they authorized the joint standing committee on sewers to prepare the necessary specifications, advertise for proposals, and make all necessary contracts for excavating and walling a portion of Mill Brook extending northerly of the portion walled in 1867, not less than 1250 feet, in accordance with the plan submitted to and adopted by the city council in 1866, and to contract for the building, renewing or repairing stone bridges at the crossing of Winter Street, Temple and Franklin Streets; also the bridge at the intersection of the Boston and Albany Railroad; these streets crossing the brook by bridges upon the section to be built under the order.

The several sections of the Mill Brook sewer laid out under the orders above referred to were put under contract, and had been nearly or quite completed before the assessment.

The sewer follows for a part of its distance the old channel of the stream, and for the remainder of its length is located entirely outside of the old channel. It is located partly through the public streets, and partly through private lands. That portion of Mill Brook sewer extending north of the south line of Front Street is covered over by an arch of uniform size, the whole distance, including such portions as are crossed by streets. That portion of the sewer south of Front Street is not covered over by an arch except at points where it is crossed by existing streets, or by contemplated streets, and at such points arched bridges are built across the sewer for the streets. Three of these arched bridges were substituted for bridges previously existing at the same points, and the new structures were more substantial and costly than the old ones. The arched bridges in all cases were built as part of the sewer under the same contracts, and the expenses were charged to the expenditure for sewers.

Mill Brook runs through the lowest part of the populous portion of the city, and the sewage of the city can be conveniently conveyed away in no other mode than into and by it. All the sewers of the city either discharge directly into Mill Brook sewer, or into other sewers that discharge directly into Mill Brook

sewer, except such sewers as discharge into the natural channel of the stream between Green and Cambridge streets, and the sewage from the last named sewers passes into Mill Brook sewer with the waters of the stream at a point about fifty feet above Cambridge Street.  All the sewers, including Mill Brook sewer, are entered by the particular drains of persons whose estates border upon them, and are designed and constructed to be so used.

The city council, by orders passed at various times from June, 1867, to November 20, 1871, laid out and constructed various sewers and drains in streets and private lands in the populous portion of the city.  These sewers and drains vary largely in size and cost.  In some instances the orders embraced a number of sewers in different streets, and in others only a single sewer in a single street or part of a street.  The first four of the orders were passed after issuing an order of notice, and hearing the parties ; and all subsequent orders, including that by which the sewer in Gold Street was laid out, were passed without any order of notice or hearing of the parties.  The last of the four orders was passed August 31, 1867.

By an order passed April 17, 1871, the city council laid out a sewer from Washington Street through Gold Street to a point near Assonet Street.

The plaintiff's estate is on Gold Street, on the line of the sewer, and consists of a lot of land with a dwelling-house thereon, and the plaintiff has connected his estate by a drain with this sewer by permission of the city.

June 6, 1870, the city council laid out a sewer from Mill Brook to a point near the Providence & Worcester Railroad, through Washington Street.  These sewers were both constructed within a few months after they were laid out.  The sewer in Gold Street discharges into the sewer in Washington Sreet, and the latter discharges into the natural channel of Mill Brook, between Green and Cambridge streets.  Many of the sewers in different parts of the city were laid out by orders dated before, and many by orders dated after, the orders by which Gold Street and Washington Street sewers were laid out.  Washington Street sewer has several sewers from side streets emptying into it beside the Gold

Street sewer. That portion of the city formerly drained by the Piedmont Street and Austin Street brooks embraces a large section of the city lying in the westerly and southwesterly portion of the city, and is now drained by sewers laid out under some of the orders before referred to, which all finally discharge into a sewer in Southbridge Street, into which are also turned the waters of Piedmont Street and Austin Street brooks, and which empties into the natural channel of Mill Brook between Green Street and Cambridge Street, which channel discharges itself, together with the waters of the Austin Street and Piedmont Street brooks, and the sewage of this section of the city, into Mill Brook sewer above Cambridge Street.

The Southbridge Street sewer and the Washington Street sewer are connected with other sewers which enter Mill Brook above Green Street only through Mill Brook sewer; the sewage from the Southbridge Street sewer and the Washington Street sewer entering the Mill Brook sewer through the natural channel of Mill Brook at a point above Cambridge Street, as above stated, while the sewers which enter Mill Brook sewer above Green Street are connected only through Mill Brook sewer. All the sewage of the city passes through these sewers into Mill Brook at points above Cambridge Street. The waters of Mill Brook and Blackstone River below Cambridge Street are polluted so as to occasion damage to the owners of water rights on said streams, by all the sewers, including the Washington Street sewer, and some of the owners have brought suits against the city, under the sewer act, for damages occasioned by the pollutions. These suits are now pending before the county commissioners.

The natural channel of Mill Brook where it receives the Southbridge Street sewer is about 3000 feet from the point where the new channel diverges at Green Street. Part of the waters of the stream run in the new channel below Green Street, and part continue to run in the natural channel below that point. The natural channel of Mill Brook between Green Street and Cambridge Street is circuitous, making a large detour to the west. The new channel runs parallel with Millbury Street, and is nearly straight. Whenever, and if, all the waters of the stream shall be

turned into the new channel at Green Street, it will become necessary to extend the Southbridge Street sewer, and connect it directly with the new channel.

Before the passage of the act of 1867, *c.* 106, the city and town of Worcester had laid out and built public sewers in several of the streets, which sewers terminated and discharged into the brook at points above Green Street, and from time immemorial the stream has been used by the city and town and by the inhabitants for sewerage purposes, and numerous private drains have discharged into it.

The natural channel of the brook between Green and Cambridge streets has never been laid out as, or become a sewer, unless the same results from the facts and proceedings herein stated.

On the first Monday of January 1872, the city government of 1871 was succeeded by one in which the mayor and four of the aldermen were changed. No notice of the intention of the board to make an assessment was ever given except the notice referred to in the following order adopted by the mayor and aldermen December 8, 1871:

" Ordered, that notice be given to all persons and parties own-.ng any real estate upon the streets in which said sewers and drains are laid [referring to streets named in the preamble of the order, Gold Street being one] or upon the line thereof, or whose real estate is benefited thereby, that this board intend to assess upon said owners their proportionate share of the expenditure of said city for said drains and sewers according to law, and the mayor and aldermen will meet in the city hall on the 19th day of December current, at 7½ o'clock P. M., to hear any objections which may be made to such assessment."

No hearing was ever had except one upon December 19, in pursuance of this notice, and afterwards it was determined " that a portion of the expense of the sewers be assessed upon the property specially benefited, and also that all the papers relating thereto be referred to the next board of aldermen."

At a meeting of the mayor and aldermen held April 15, 1872, the committee on sewers on the part of the board, to whom the subject had been verbally referred, but not by any recorded vote,

made a report of the persons and estates benefited by the sewers constructed by the city, with the value of the lands without buildings or improvements; and the land of the least value, that valued at 10 cents or less a foot, was assessed 8 per cent., and land of the highest value, that valued at $7 a foot, together with that valued at over $6, was assessed 2 per cent., and lands of an intermediate value were assessed upon a sliding scale between these extremes. At the same meeting this report was accepted, and the orders therein referred to were adopted. The names of the persons and estates assessed were contained in twenty-six schedules. In each schedule, the figures opposite each name under the column of "per cent." were the same throughout the schedule, but differed in the different schedules. Each of the schedules was followed by an order, stating in the preamble the whole amount to be assessed upon the persons and estates enumerated in the schedule, and ordering that each be assessed the sum set against his name.

The sum named in the preamble of the order following the schedule containing the plaintiff's name and estate was $62,525. The plaintiff's name and estate were contained in the third schedule, in which, under the column "per cent.," were the figures 6¼. Each of the several lists contained estates situated in different parts of the city where sewers had been laid, and the list containing the assessment of the plaintiff's estate contained assessments upon estates situated in eighty-one different streets in sections of the city remote from each other, and on the line of sewers which were laid out at different times.

The last ten of the lists were of estates situated on streets in which had been laid, prior to the St. of 1867, *c.* 106, sewers which had formerly discharged into the natural channel of Mill Brook, but which are now connected with and discharge into the new Mill Brook sewer.

The valuation of the estates contained in the lists corresponds with the valuation of the land without improvements adopted by the assessors for the year 1870, for the purposes of taxation.

After the assessment, on application of parties assessed, abatements were made by the board on account of errors in the assess-

ment. The plaintiff never applied for any abatement of his assessment, and none was ever made, and no change was made in unabated assessments on account of abatements.

At the time of the assessment, the city owned various tracts of land on streets in which sewers were laid, and upon the line thereof, used for school-houses, engine-houses, other municipal purposes, and as burying grounds, which could be drained by such sewers, and none of these estates were included in the assessment. Upon the old common or training field, belonging to the city, containing about seven acres, and laid out with walks, shade trees and ornamental structures, is situated the city hall, and also an ancient meeting-house, known as the Old South Meeting-house, belonging to the first parish in Worcester. Rooms in the city hall are rented to the county for the use of the District Court. The common is bounded on two sides by streets in which sewers were built. It was not included in the assessment, but can be drained by the sewers.

At the time of the assessment, the whole amount expended by the city for sewers and drains, under the act of 1867, was between $1,100,000 and $1,200,000, and the amount expended, exclusive of all sums paid for land damages and water rights, exceeded one million dollars, of which the expenditure for the Mill Brook sewer was $468,000. The cost of the improvement in that part of Mill Brook between Green and Cambridge streets was about $75,000. All the estates included in the several schedules, situated upon streets where sewers were constructed in 1867, 1868 and 1869, and benefited thereby, had increased in value on account of the construction of the sewers and other causes between the times when such sewers respectively were constructed and the time of taking the valuation of 1870, and all estates on the line of all the sewers constructed prior to the assessment were for the same causes increased in value.

At the time of the assessment, several sewers laid out under some of the orders were constructed for portions of their length only, and in such cases only the estates on the line of those parts of the sewers that were completed were included in the assessment, and estates on the line of those parts of the sewers not

completed were not included, and since the assessment the city has laid out new sewers branching off from the sewers assessed at various points.

The whole length of sewers laid in streets under the act of 1867 is about twenty-four miles. The cost of some of the sewers was greater and of others less than the cost of the sewer in Gold Street, owing to the nature of the soil, the size and construction of the sewers and other causes.

The whole amount assessed was $450,001, and the whole number of assessments was 2235.

The amount of the assessment on each estate was equal to the product of the valuation at even hundreds of the estate, multiplied by the per cent. of the class in which the estate was placed.

The funds to meet the expenditures for sewers and drains built under the act of 1867, were raised in the first instance by a temporary loan payable on call. This debt was afterwards funded in part by the issue of sewer bonds to the amount of $499,000, issued under the act of 1867, and St. 1870, *c.* 155. A part of this temporary loan was met by a loan of $500,000, payable in ten years, which was effected in 1871. The balance, which is less than $450,000, was represented in a temporary loan of $562,000, existing at the time the assessment was made.

Upon this statement of facts, judgment was given for the defendant, and the plaintiff appealed.

*H. B. Staples & F. P. Goulding*, for the plaintiff.

*G. F. Hoar & T. L. Nelson*, (*G. F. Verry* with them,) for the defendant.

GRAY, C. J. The St. of 1867, *c.* 106, manifests the opinion and determination of the Legislature that the ordinary provisions of the statutes for the construction of common sewers and the assessment of a portion of the expense of each upon the adjacent estates were inadequate to the needs of a large and rapidly increasing city, not situated upon any river or upon tide water and that it was necessary to adopt a new and comprehensive system, by which the natural watercourses within the limits of the city of Worcester might be appropriated and adapted to the discharge of the sewage of the whole city, and a proportion of the

cost of the extensive works required to carry into effect this purpose be assessed upon all the estates benefited thereby.

The case finds that Mill Brook runs through the lowest part of the populous portion of the city, affords the only way by which the sewage of the city can be conveniently carried off, and has from time immemorial been used by the town and city of Worcester and the inhabitants thereof for the purposes of sewerage, and that all the sewers of the city discharge directly or indirectly into it.

By the first section of the St. of 1867, *c.* 106, the city council of Worcester is authorized to lay, make, maintain and repair all such drains and common sewers as it shall adjudge to be for the public health or convenience; and the city and its citizens are to have the same rights and be subject to the same liabilities as if this were done under the Gen. Sts. *c.* 48, " except as hereinafter provided."

By section 2 the city council is expressly authorized to fix the boundaries of Mill Brook and certain other brooks emptying into it, to alter, clear out, widen, deepen and straighten their channels, and to use and appropriate the brooks, cover them, pave them, and wall them in, so far as it shall adjudge necessary for the purposes of sewerage, drainage and the public health. The powers thus conferred extend to the whole of these brooks within the city. The report previously made by a committee of the city council is referred to in the statute, only by way of assisting in identifying the brooks named; and the fact that the earlier statutes of 1850, *c.* 191, § 4, and 1866, *c.* 199, § 13, limited the similar authority thereby granted to a part of Mill Brook gives the greater significance to the more general words of the St. of 1867, *c.* 106, § 2.

The orders successively passed by the city council, appropriating and laying out continuous sections of Mill Brook as a main drain and common sewer, changing and straightening its course, clearing out, deepening and paving the channel, walling it in, and covering it with a continuous arch for a portion of its length, and with bridges at the crossings of the streets over the rest, so that it should not obstruct the public travel, were within the authority

conferred by that section. And the cost of all this work, as well as of constructing drains and common sewers in the neighboring streets under § 1, might properly be included in " the expenditure of the city for drains and sewers " under § 4.

By section 3 the city council is further authorized to take and hold, by purchase or otherwise, such land, water rights, dams and other real estate, and so use, alter or remove the same, as it shall adjudge necessary for the purposes aforesaid. It would seem that the sum paid by the city to the owners of the Fox mill-dam, removed to make way for the Mill Brook sewer, was within the contemplation of this section, and might lawfully be deemed part of the same expenditure. But as the case does not show that any part of that sum was included in the amount levied by assessment, it is unnecessary to consider that point more particularly.

Section 4 provides that " every person owning real estate upon any street in which any drain or sewer may be laid under or by virtue of this act, and upon the line thereof, or whose estate may be benefited thereby, shall pay to said city such sum as the mayor and aldermen shall assess upon him as his proportionate share of the expenditure of the city for drains and sewers ; " that the sum so assessed shall constitute a lien upon the estate for two years, and, if not paid within ninety days after notice, may be levied by sale of the estate ; and that any person aggrieved by the doings of the mayor and aldermen under this section may, at any time within three months after such notice, apply for a jury in the manner provided in the Gen. Sts. *c.* 48, § 6.

The Legislature evidently anticipated that the expense of altering the brooks into common sewers, in order to fit them for effectually carrying off the whole sewage of the city, would be so great, and the size and cost of the different drains leading into them, and required for the completion of the whole system of drainage, so various, that it might be unjust to assess the cost of each sewer and drain upon the estates abutting thereon or immediately benefited thereby. It has therefore provided that such estates may be assessed a proportional share of the whole expenditure of the city for drains and sewers under the act.

It is now too well settled to require a discussion of the general proposition, that a statute authorizing the cost of a local improvement of this kind to be levied by assessment upon the estates benefited thereby, according to the judgment of the municipal authorities in the first instance, and allowing to any party, aggrieved by their estimate, the right to have it revised by a jury, is within the constitutional power of the Legislature. *Dorgan* v. *Boston,* 12 Allen, 223. *Jones* v. *Aldermen of Boston,* 104 Mass. 461. *People* v. *Mayor, &c. of Brooklyn,* 4 Comst. 419. *Brewster* v. *Syracuse,* 19 N. Y. 116. *Commonwealth* v. *Woods,* 44 Penn. State, 113. *Willard* v. *Presbury,* 14 Wall. 676.

It appears by the facts agreed that, before the assessment was laid of which the plaintiff complains, the several sections of the Mill Brook sewer had been nearly or quite completed, as well as a great number of drains and common sewers, directly or indirectly connecting therewith, in many streets of the populous portion of the city, and, among others, in Gold Street, upon which the plaintiff's estate was situated, and that he, by permission of the city, entered a private drain from it into the common sewer in that street. He was therefore liable to be assessed under the statute for a proportion of the whole expenditure of the city for sewers and drains.

If any land-owner could object to the validity of the laying out of the common sewers in the streets, for want of previous notice to him, this plaintiff could not, since he has entered his private drain into the one in front of his estate. *Haskell* v. *New Bedford,* 108 Mass. 208.

It is objected that the plaintiff and other parties assessed were entitled to notice and hearing, upon the question of the amount to be assessed upon them, before the tribunal that laid the assessment; and that the only notice and hearing were before the mayor and aldermen of 1871, but the assessment was made by the mayor and aldermen of 1872, who were not the same persons. But the statute does not require any notice to be given by the mayor and aldermen before laying the assessment, and fully secures the rights of any party assessed, by requiring notice to be given to him of the assessment when made, and allowing him to

appeal to a jury if dissatisfied. *Allen* v. *Charlestown*, 111 Mass. 123. The question whether any hearing should be had before laying the assessment rested therefore in the discretion of the mayor and aldermen. The mayor and aldermen of 1871 gave public notice, to all parties liable to assessment under the statute, that it was intended to assess upon them "their proportionate share of the expenditure of said city for drains and sewers according to law," and that they might be heard on "any objections which may be made to said assessment;" and after such hearing determined that "a portion of the expense of the sewers be assessed upon the property specially benefited," and then referred the papers to the next board of aldermen. The plaintiff was not entitled as matter of right to be heard before the new board on the amount to be assessed upon his estate. His remedy, if he was dissatisfied with that amount, should have been sought by application to the mayor and aldermen for an abatement, or by petition for a jury as provided in § 4. *Whiting* v. *Mayor & Aldermen of Boston*, 106 Mass. 89.

It is objected that the assessment was invalid, because it included estates which were not liable to assessment, and omitted estates that were liable. But the question whether the assessment was erroneous in either respect cannot properly be determined in this case, to which the owners of the estates affected are not all parties. If it was so erroneous, it may be revised on *certiorari*, but affords no reason why the owner of an estate which is liable to assessment should escape all liability. *Le Roy* v. *Mayor of New York*, 20 Johns. 430. *Smith's Case*, 1 Ventr. 66. *Board of Works* v. *Vauxhall Bridge*, 7 E. & B. 964.

The mayor and aldermen having adjudged that the plaintiff's and other estates liable to assessment were benefited, and that the sum assessed upon each was its proportionate share of the expenditure, the errors suggested in the mode of computation, if well founded, can only be revised by *certiorari*. All the estates are assessed according to their valuation, dividing them into several classes according to their value per foot, and assessing all those in each class at one ratio. The moderate variation in the percentage of the different classes, making the proportion of the

assessment somewhat greater upon the estates of the less value per foot, and somewhat less upon those of the greater value, does not show that the entire scheme was so unreasonable, or operated so unjustly upon the plaintiff, that it can be declared to be wholly invalid.

The decisions of this court, cited for the plaintiff, are quite distinguishable. In *Boston* v. *Shaw*, 1 Met. 130, the point decided was that a city ordinance, (passed under the general power to make reasonable by-laws, and before cities had been authorized by statute to lay main drains and common sewers,) by which an assessment for the construction of a sewer, upon those individuals who should enter their particular drains into it, was laid according to the existing value of their estates, including the value of the buildings upon those already built upon, and only the value of the vacant lots upon which no buildings had been erected, was unreasonable and void. The cases of *Downer* v. *Boston*, 7 Cush. 277, and *Wright* v. *Boston*, 9 Cush. 233, arose under the St. of 1841, *c.* 115, authorizing the municipal authorities to make and maintain main drains and common sewers, and to assess a proportional part of the charge upon every person entering his particular drain into the sewer or receiving any benefit thereby; and the only point decided in either case was that an ordinance laying an assessment according to the value of the lands, independently of any buildings or improvements thereon, was valid. See also *Springfield* v. *Gay*, 12 Allen, 612.

The authority of the mayor and aldermen under the St. of 1867, *c.* 106, § 4, is not affected by the exercise by the city council of the power conferred by § 5 to issue scrip for the purpose of defraying the expenses and outlays incurred for the purposes named in the act.

This case does not involve the determination of the proper mode of assessing future expenses of laying new drains and sewers, or of repairing those already laid.

*Judgment for the defendant.*