## OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

The Justices of the Supreme Judicial Court were of opinion that it was constitutionally competent for the General Court, as proposed by a bill pending in the House and entitled "An Act to Incorporate the Metropolitan Transit System and to Authorize Such Corporation to Acquire the Properties and Franchises of the Boston Elevated Railway Company," to authorize the Boston Elevated Railway Company to sell its property, privileges and franchises to a corporation chartered by the General Court for the purpose of acquiring the same upon terms and conditions set forth by the General Court, if such sale is authorized by the holders of not less than a majority in amount of the capital stock of the Boston Elevated Railway Company, including both the preferred stock of all classes and the common stock, voting thereon at a meeting called for the purpose.

It is constitutionally competent for the General Court to authorize the Boston Elevated Railway Company to dissolve and liquidate its affairs, substantially as set forth in the provisions of the bill above described, (1) by other than a unanimous vote of all its stock of all classes; (2) by a vote of the majority of all its stock of all classes voting equally, without regard as to whether a majority vote is obtained of each or any one of the three classes of preferred stock now outstanding; (3) by a vote of a majority of all the stock of all classes present and voting equally, if a quorum is present.

Such legislation would not be constitutional if certain provisions therein, giving to nonassenting stockholders the right to have their stock valued, were eliminated.

Upon liquidation under the proposed statute above described, the General Court might provide that holders of preferred stock issued under and in accordance with St. 1911, c. 740, § 2, and Spec. St. 1918, c. 159, § 5, shall receive such payment in cash as is provided in the event of liquidation in said statutes and the terms of issue of such preferred stock, or exercise such rights of conversion into common stock as they have, without appeal to any judicial tribunal for a valuation of their shares.

It is constitutionally competent for the General Court to authorize or require retirement by the Boston Elevated Railway Company of any class or classes of the company's stock by the exercise of the power of eminent domain, or otherwise.

vote of a majority of all the stock of all classes present and voting equally, if a quorum is present.

If the bill pending in the House and above described, to incorporate a new corporation which should acquire the properties and franchises of the Boston Elevated Railway Company, were enacted into law, the General Court thereafter could not, by virtue of art. 59 of the Amendments to the Constitution of the Commonwealth, constitutionally amend, alter or repeal such provisions of said bill as are declared thereby to constitute a contract binding upon the Commonwealth, or any of them.

The provisions of art. 63, § 1, of the Amendments to the Constitution of the Commonwealth would not apply to the receipts from operation during the period of an extension of the system of public operation and management of the Boston Elevated Railway Company as proposed by the Senate bill described, or of public operation and management as proposed by the House bill above described.

The enactment by the General Court of a law extending public management of the Boston Elevated Railway Company or creating a new contract of public management of that company and providing in certain events for the lending of the credit of the Commonwealth upon such extension or contract as provided in the bill pending in the Senate or that pending in the House, above described, would not be repugnant to art. 62, § 1, of the Amendments to the Constitution of the Commonwealth on the ground that said amendment permits the lending of credit only to a private corporation which at the time of the adoption of said amendment was publicly managed, or on any other ground.

The provisions of art. 62 of the Amendments to the Constitution of the Commonwealth do not apply to a section of the Senate bill above described requiring the Treasurer and Receiver General to sign and guarantee the bonds and other evidences of indebtedness of the Boston Elevated Railway Company.

The Justices were unable to perceive in the provisions of the proposed bill pending in the Senate and above described anything which constituted "joint control for operating and maintaining the Boston Elevated Railway Company" in its vital features as a public corporation, and therefore answered in the negative a question, "Is the joint control for operating and maintaining the Boston Elevated Railway Company" as set forth in that bill "repugnant to art. 62 of the Amendments to the Constitution of the Commonwealth?"

It would not be a violation of the Constitution of Massachusetts, and particularly of art. 62 of the Amendments thereto, for the Legislature to enact the proposed legislation pending in the Senate, by the terms of which a constitutional officer of the executive branch of the State government, namely, the Treasurer and Receiver General, would be required upon request of the trustees mentioned in the bill, who are specifically exempted from the provisions of G. L. c. 271, § 40, and other provisions of law, to pledge the credit of the Commonwealth and to guarantee the bonds, notes and other evidences of indebtedness of the Boston Elevated Railway Company, the money secured thereby to be used in the operation and management of the railway company organized as a corporation with a board of·directors elected by its stockholders and given power under the provisions of the legislation

pending in the Senate above described to govern, veto and nullify the acts of the so called public trustees, thereby keeping within the control of the corporation, through its stockholders and directors, the operation and management of the railway company as a private corporation specifically prohibited from receiving in any manner the aid or loan of the credit of the Commonwealth by the terms of said art. 62 of the Amendments to the Constitution of Massachusetts.

The provisions of a certain section of the legislation pending in the Senate as above described, whereby the board of directors of the Boston Elevated Railway Company, a private corporation, would retain in certain cases control over the making of contracts for operation or lease of subways, elevated or surface lines or extensions thereof and over the construction or purchase of surface lines, in conjunction with Spec. St. 1918, c. 159, § 11, or any provision of the proposed legislation pending in the Senate, as amended, providing for the loan of the credit of the Commonwealth, are not repugnant to art. 62, § 1, of the Amendments to the Constitution of the Commonwealth as a retention in part of private management and a failure to provide for complete and exclusive public management, or for any other reason.

The General Court has power under the Constitution to authorize the assessment of all or a specified part of the cost of a public improvement or of the extension thereof, consisting of additional facilities for rapid transit of passengers, which is to be built by a board of public officers and owned by the Commonwealth or by a municipal corporation, but leased to and operated by a private corporation, upon the area which will receive benefit and advantage beyond the general advantage to the community from the construction and operation of such improvement or extension, to an amount not in excess of such benefit and advantage, as proposed in a bill proposed in the Senate bill above described.

The General Court has power to provide for the determination of the boundaries of such area and the total amount of such benefit and advantage by commissioners appointed by the Supreme Judicial Court, after a hearing, of which reasonable notice by publication has been given, and further to provide that the report of the commissioners, after acceptance and confirmation by the court, shall be final and conclusive as to all matters properly included therein.

The General Court has power to provide that the amount so assessed shall be apportioned among the several parcels of land within such area in proportion to the valuation of such parcels for purposes of taxation, reserving to the owners of such parcels the right to apply for a reduction of the valuation in the same manner as in the case of general taxes.

If the improvement or extention described above is to be paid for through funds raised by bonds, the General Court has power to provide that assessments for payment of the bonds shall be spread over the life of the bonds by annual payments bearing the same relation to the sum required to meet the annual payments for interest and sinking fund upon the bonds as the amount of benefit to be assessed bears to the cost of the improvement or extension.

The General Court has power to provide that the area upon which the betterments above described shall be assessed may be divided by the commissioners into zones, consisting respectively of land which will

receive a more direct and special advantage from the improvement or extension than the rest of the area, and land benefited by more remote means, and that the commissioners may determine the proportion of the assessment to be levied on each zone; and further to provide that the proportion assigned to each zone shall be apportioned among the several parcels within such zone in proportion to valuation for purposes of taxation, such assessment not to exceed the amount of special benefit conferred upon the parcels by the proposed public improvement.

The General Court has power to authorize additional transportation facilities, including equipment, which have been acquired with money borrowed by the issuance of bonds of the Commonwealth or of a municipal corporation, to be leased to the Boston Elevated Railway Company, a private corporation, for a term of years extending beyond the fixed term of public control established by Spec. St. 1918, c. 159, or beyond the period when said term may be terminated as provided in said chapter, or for a term of years beginning after the termination of public control or after the giving of notice to terminate, and at a rental, as proposed in a certain bill pending in the Senate, which is less than the interest charges on the said bonds, and to provide, as proposed in that bill, that the balance of the interest charges and the sinking fund and serial payments shall be met from betterment assessments or taxes, and that after the maturity of the bonds the rental shall be such sum only as will adequately cover the maintenance and upkeep of the leased property and equipment.

It is constitutionally competent for the General Court, as proposed in a bill pending in the Senate relating to the extension of an improvement of transit facilities in Boston, to assess a betterment on property for subway, tunnel, or rapid transit facilities, including equipment, if such subway, tunnel, or other facility, including equipment, is leased to the Boston Elevated Railway Company for a term of years at a rental less than the interest and sinking fund charges during such term on the State or municipal bonds issued to finance such undertaking; and if the lease provides, as specified in certain portions of said bill, that after the maturity of the bonds the cash rental shall be abated so that the rental will consist only of "such a sum as will adequately cover the maintenance and upkeep of the leased property and equipment."

It is constitutionally competent for the General Court, as provided in the Senate bill above described relating to an extension and improvement of transit facilities in Boston, to assess and levy taxes toward meeting in part the cost of subway, tunnel, or rapid transit facilities, including equipment, if such subway, tunnel, or other facility, including equipment, is leased to the Boston Elevated Railway Company for a term of years at a rental less than the interest and sinking fund charges during such term on State or municipal bonds issued to finance such undertaking, and if the lease provides, as specified in certain provisions of said act, that after the maturity of the bonds the cash rental shall be abated so that the rental will consist only of "such a sum as will adequately cover the maintenance and upkeep of the leased property and equipment."

It is not constitutionally competent for the General Court, even if such sale should be authorized by the holders of not less than a majority in

amount of the capital stock of the railway company, including both the preferred stock of all classes and the common stock, voting thereon at a meeting called for the purpose, to require the Boston Elevated Railway Company to sell and the Commonwealth to buy the whole assets, property and franchises of said railway company as a going concern and to authorize the Commonwealth upon thus acquiring said assets, property and franchises of the railway company to incorporate a new corporation which shall be privately owned and shall purchase and acquire the said assets, property and franchises from the Commonwealth with power to operate the same either under an extension of the present system of public operation and management or otherwise.

It is not constitutionally competent for the General Court to require the Boston Elevated Railway Company to sell and the Commonwealth to buy the whole assets, property and franchises of said railway company as a going concern under the option and on the terms provided in Spec. St. 1918, c. 159, § 16, and to authorize the Commonwealth upon the acquisition thereof to incorporate a new corporation which shall be privately owned and shall purchase and acquire the said assets, property and franchises from the Commonwealth with power to operate the same either under an extension of the present system of public operation and management or otherwise.

The Justices of the Supreme Judicial Court, having presented to them by an order of the House of Representatives certain questions relating not only to the constitutionality of legislation pending in the House, but also of legislation on the same general subject pending in the Senate, expressed grave doubt as to whether under c. 3, art. 2, of the Constitution their opinion upon the legislation pending in the Senate rightly could be required by such an order; but they made answers to the questions propounded and in answering the questions *stated* that such answers were not to be regarded as establishing a practice, but left open the question, whether such answers thus could be required.

The Justices of the Supreme Judicial Court having given their opinion under c. 3, art. 2, of the Constitution upon certain specific questions relating to the constitutionality of a proposed act pending in the House of Representatives and covering over twenty-five pages of the printed record, respectfully asked to be excused from answering general questions, whether the act would be "constitutional in every particular."

THE following order was adopted by the House of Representatives on April 25, 1927, and was transmitted to the Justices of the Supreme Judicial Court on May 6, 1927:

WHEREAS, There is pending before the General Court a bill entitled "An Act to Incorporate the Metropolitan Transit System and to Authorize Such Corporation to Acquire the Properties and Franchises of the Boston Elevated Railway Company," printed as House, No. 522, copy of which is

hereto annexed, which said bill has been used as a basis for a bill now pending before the General Court entitled "An Act Extending the Term of the Lease to the Commonwealth of the Properties of the Boston Elevated Railway Company and Continuing Public Management and Operation thereof," printed as Senate, No. 276, as amended, copy of which is hereto annexed, which said bills relate to the policy to be pursued by the Commonwealth in regard to the continuance of the public operation and management of the Boston Elevated Railway Company or of a corporation authorized to acquire the properties and franchises thereof; and

WHEREAS, There is also pending before the General Court a bill entitled "An Act Providing for the Extension and Improvement of Rapid Transit Facilities in the City of Boston," printed as Senate, No. 285, copy of which is hereto annexed, which said bill relates to the construction and improvement of certain rapid transit routes and the leasing of the same to the Boston Elevated Railway Company; and

WHEREAS, The House of Representatives is of the opinion that the General Court ought not to proceed further in its consideration of the issues involved in these bills until certain grave constitutional questions involved therein are disposed of: therefore be it

ORDERED, That the opinions of the Honorable the Justices of the Supreme Judicial Court be required on the following important questions of law: —

1. Is it constitutionally competent for the General Court, as proposed in said bill House, No. 522, to authorize the Boston Elevated Railway Company to sell its property, privileges and franchises to a corporation chartered by the General Court for the purpose of acquiring the same upon terms and conditions set forth by the General Court, if such sale is authorized by the holders of not less than a majority in amount of the capital stock of the Boston Elevated Railway Company, including both the preferred stock of all classes and the common stock, voting thereon at a meeting called for the purpose?

2. Is it constitutionally competent for the General Court to authorize the Boston Elevated Railway Company to

dissolve and liquidate its affairs substantially as set forth in the provisions of said bill, House, No. 522:

(a) by other than a unanimous vote of all its stock of all classes;

(b) by a vote of the majority of all its stock of all classes voting equally, regardless as to whether a majority vote is obtained of each or any one of the three classes of preferred stock now outstanding;

(c) by a vote of a majority of all the stock of all classes present and voting equally, if a quorum is present;

(d) If the provisions of section 6 and other sections of said bill, House, No. 522, giving to non assenting stockholders the right to have their stock valued, were eliminated?

2A. Upon such liquidation, if constitutional, may the General Court provide that holders of preferred stock issued under and in accordance with section 2 of chapter 740 of the Acts of 1911 and section 5 of chapter 159 of the Special Acts of 1918 shall receive such payment in cash as is provided in the event of liquidation in said statutes and the terms of issue of such preferred stock, or exercise such rights of conversion into common stock as they have, without appeal to any judicial tribunal for a valuation of their shares?

3. Is it constitutionally competent for the General Court to authorize or require retirement by the Boston Elevated Railway Company of any class or classes of the company's stock by the exercise of the power of eminent domain, or otherwise?

4. Is it constitutionally competent for the General Court to provide for the acceptance of said bill, Senate, No. 276, as amended, by the Boston Elevated Railway Company by:

(a) other than a unanimous vote of all stock of all classes;

(b) a vote of a majority of all its stock of all classes voting equally, regardless as to whether a majority vote is obtained of each or any one of the three classes of preferred stock now outstanding;

(c) by a vote of a majority of all the stock of all classes present and voting equally, if a quorum is present?

5. Would the provisions of Senate, No. 276, as amended, if further amended by the substitution therefor of said

House, No. 522, be constitutional in every particular, if enacted into law?

6. If said bill, House, No. 522, were enacted into law, could the General Court thereafter, by virtue of the fifty-ninth article of the Amendments to the Constitution of the Commonwealth, constitutionally amend, alter or repeal such provisions of said bill as are declared thereby to constitute a contract binding upon the Commonwealth, or any of them?

7. Would the provisions of Senate, No. 276, as amended, providing for the acceptance of the terms of said bill by the Boston Elevated Railway Company by affirmative vote of a majority of each class of stock thereof given at a meeting called for the purpose, be constitutional in every particular, if enacted into law?

8. Under an extension of the present system of public operation and management of said company under said Senate, No. 276, as amended, or under public operation and management under said House, No. 522, would the provisions of section 1 of the sixty-third article of the Amendments to the Constitution of the Commonwealth apply to the receipts from operation during the period of such operation and management?

9. Would the enactment by the General Court of a law extending public management of the Boston Elevated Railway Company, a private corporation, or creating a new contract of public management of said company, and providing in certain events for the lending of the credit of the Commonwealth under such extension or contract, as proposed in said Senate, No. 276, or in said House, No. 522, be repugnant to section 1 of Article LXII of the Amendments to the Constitution of the Commonwealth on the ground that said amendment only permits the lending of credit to a private corporation which at the time of the adoption of said amendment was publicly managed, or on any other ground?

10. Do the provisions of Article LXII of the Amendments to the Constitution apply to section 15 of Senate, No. 276, requiring the Treasurer and Receiver-General to sign and

guarantee the bonds and other evidences of indebtedness of the Boston Elevated Railway Company?

11. Is the joint control for operating and maintaining the Boston Elevated Railway Company, as set forth in said bill, Senate, No. 276, repugnant to Article LXII of the Amendments to the Constitution of the Commonwealth?

12. Would it be a violation of the Constitution of Massachusetts, and particularly of Article LXII of the amendments thereof, for the Legislature to enact the bill printed as Senate, No. 276, by the terms of which bill a constitutional officer of the executive branch of the state government, namely, the Treasurer and Receiver-General is required upon request of the trustees mentioned in said bill, which trustees are specifically exempted from the provisions of section 40 of chapter 271 of the General Laws and other provisions of law, to pledge the credit of the Commonwealth and guarantee by endorsing the bonds, notes and other evidences of indebtedness of the Boston Elevated Railway Company, the money secured thereby to be used in the operation and management of said railway company organized as a corporation with a board of directors elected by its stockholders and given power under the provisions of said bill, Senate, No. 276, to govern, veto and nullify the acts of the so-called public trustees, thereby keeping within the control of the corporation, through its stockholders and directors, the operation and management of said railway company as a private corporation specifically prohibited from receiving in any manner the aid or loan of the credit of the Commonwealth by the terms of said Article LXII of the Amendments to the Constitution of Massachusetts?

13. Are the provisions of section 3 of said Senate, No. 276, as amended, whereby the board of directors of the Boston Elevated Railway Company, a private corporation, would retain in certain cases control over the making of contracts for operation or lease of subways, elevated or surface lines or extensions thereof and over the construction or purchase of surface lines, in conjunction with section eleven of chapter one hundred and fifty-nine of the Special Acts of nineteen hundred and eighteen or any provision of said Senate,

No. 276, as amended, providing for the loan of the credit of the Commonwealth, repugnant to section 1 of Article LXII of the Amendments to the Constitution of the Commonwealth as a retention in part of private management and a failure to provide for complete and exclusive public management, or for any other reason?

14. Has the General Court power under the Constitution to authorize the assessment of all or a specified part of the cost of a public improvement or of the extension thereof, consisting of additional facilities for rapid transit of passengers, which is to be built by a board of public officers and owned by the Commonwealth or by a municipal corporation, but leased to and operated by a private corporation, upon the area which will receive benefit and advantage beyond the general advantage to the community from the construction and operation of such improvement or extension, to an amount not in excess of such benefit and advantage as proposed in Senate, No. 285?

15. If the answer to the next preceding question is in the affirmative, has the General Court power to provide for the determination of the boundaries of such area and the total amount of such benefit and advantage by commissioners appointed by the Supreme Judicial Court, after a hearing of which reasonable notice by publication has been given, and further to provide that the report of the commissioners, after acceptance and confirmation by the court, shall be final and conclusive as to all matters properly included therein?

16. If the answers to the two next preceding questions are in the affirmative, has the General Court power to provide that the amount so assessed shall be apportioned among the several parcels of land within such area in proportion to the valuation of such parcels for purposes of taxation, reserving to the owners of such parcels the right to apply for a reduction of the valuation in the same manner as in the case of general taxes?

17. If the answers to the three next preceding questions are in the affirmative, and the improvement or extension thereof is to be paid for by bonds, has the General Court

power to provide that the assessment shall be spread over the life of the bonds by an annual payment bearing the same relation to the sum required to meet the annual payments for interest and sinking fund upon the bonds as the amount of benefit to be assessed bears to the cost of the improvement or extension?

18. If the answers to the four next preceding questions are in the affirmative, has the General Court power to provide that the area to be assessed may be divided by the commissioners into zones, consisting respectively of land which will receive a more direct and special advantage from the improvement or extension than the rest of the area, and land benefited by more remote means, and that the commissioners may determine the proportion of the assessment to be levied on each zone; and further to provide that the proportion assigned to each zone shall be apportioned among the several parcels within such zone in proportion to valuation for purposes of taxation?

19. Has the General Court power to authorize additional transportation facilities, including equipment, which have been acquired with money borrowed by the issuance of bonds of the Commonwealth or of a municipal corporation, to be leased to the Boston Elevated Railway Company, a private corporation, for a term of years extending beyond the fixed term of public control established by chapter one hundred and fifty-nine of the Special Acts of nineteen hundred and eighteen or beyond the period when said term may be terminated as provided in said chapter, or for a term of years beginning after the termination of public control or after the giving of notice to terminate, and at a rental, as proposed in Senate, No. 285, which is less than the interest charges on the said bonds, and to provide, as proposed in Senate, No. 285, that the balance of the interest charges and the sinking fund and serial payments shall be met from betterment assessments or taxes, and that after the maturity of the bonds the rental shall be such sum only as will adequately cover the maintenance and upkeep of the leased property and equipment?

20. Is it constitutionally competent for the General

Court, as proposed in Senate, No. 285, to assess a betterment on property for subway, tunnel, or rapid transit facilities, including equipment, if such subway, tunnel, or other facility, including equipment, is leased to the Boston Elevated Railway Company for a term of years at a rental less than the interest and sinking fund charges during such term on the state or municipal bonds issued to finance such undertaking, and if the lease provides, as specified in lines fifty-six to fifty-nine of section five of said Senate, No. 285, that after the maturity of the bonds the cash rental shall be abated so that the rental will consist only of "such a sum as will adequately cover the maintenance and upkeep of the leased property and equipment"?

21. Is it constitutionally competent for the General Court as provided in Senate, No. 285, to assess and levy taxes toward meeting in part the cost of subway, tunnel, or rapid transit facilities, including equipment, if such subway, tunnel, or other facility, including equipment, is leased to the Boston Elevated Railway Company for a term of years at a rental less than the interest and sinking fund charges during such term on state or municipal bonds issued to finance such undertaking, and if the lease provides, as specified in lines fifty-six to fifty-nine of section five of said Senate, No. 285, that after the maturity of the bonds the cash rental shall be abated so that the rental will consist only of "such a sum as will adequately cover the maintenance and upkeep of the leased property and equipment"?

22. Would the provisions of Senate, No. 285, be constitutional in every particular, if enacted into law?

23. Is it constitutionally competent for the General Court to require the Boston Elevated Railway Company to sell and the Commonwealth to buy the whole assets, property and franchises of said railway company as a going concern if such sale is authorized by the holders of not less than a majority in amount of the capital stock of the railway company, including both the preferred stock of all classes and the common stock, voting thereon at a meeting called for the purpose, and to authorize the Commonwealth upon thus acquiring said assets, property and franchises of the

railway company to incorporate a new corporation which shall be privately owned and shall purchase and acquire the said assets, property and franchises from the Commonwealth with power to operate the same either under an extension of the present system of public operation and management or otherwise?

24. Is it constitutionally competent for the General Court to require the Boston Elevated Railway Company to sell and the Commonwealth to buy the whole assets, property and franchises of said railway company as a going concern under the option and on the terms provided in section 16 of chapter 159 of the Special Acts of 1918 and to authorize the Commonwealth upon the acquisition thereof to incorporate a new corporation which shall be privately owned and shall purchase and acquire the said assets, property and franchises from the Commonwealth with power to operate the same either under an extension of the present system of public operation and management or otherwise?

The bill entitled in the foregoing order "Senate No. 276 as amended" is quoted *ante*, pages 1915–1929.

The bill referred to in the order as "House No. 522" was as follows:

An Act to incorporate the Metropolitan Transit System and to authorize such corporation to acquire the properties and franchises of the Boston Elevated Railway Company.

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:

SECTION 1. The metropolitan transit system (sometimes hereinafter called the "New Company") is hereby created a body corporate with the powers provided in this act and with all the general corporate powers incident thereto, including without limiting the generality of the foregoing, all powers granted under the provisions of sections six, seven and eight of chapter one hundred and fifty-five of the General Laws and clauses (a), (c) and (d) of section four of chapter one hundred and fifty-six of the General Laws.

SECTION 2. A board of public incorporators is hereby created to consist of three members (sometimes hereinafter called the "Incorporators") to be appointed by the governor with the advice and consent of the council. Upon the filing with the secretary of the Commonwealth of the certificate provided for in section three of this act the incorporators shall forthwith enter upon the performance of their duties and shall serve as incorporators and as a board of directors of the new company for a term of one year or until the stockholders of the new company shall have elected a board of directors at the time and in the manner in this act provided:

(a) The incorporators shall designate from among their number a chairman and a clerk of the board and the incorporator so designated as clerk shall be sworn to the faithful performance of his duties;

(b) The incorporators may act by a majority of their number and the action of such majority shall constitute the action of the incorporators with the same effect as though assented to by all of them;

(c) Until the first meeting of the stockholders of the new company, the incorporators shall have and exercise all the powers of such stockholders and may adopt by-laws not inconsistent with the provisions of this act, which by-laws shall be in effect until amended or repealed by such stockholders;

(d) The incorporators may appoint such officers, attorneys and other agents of the new company as may be necessary or convenient for the proper transaction of its business and for carrying out the provisions of this act;

(e) The governor by and with the consent of the council shall determine the compensation of the incorporators which shall be paid by the new company, may remove any of them from office and shall fill any vacancy in their number.

SECTION 3. The Boston Elevated Railway Company (sometimes hereinafter called the "Elevated") is authorized to sell and the metropolitan transit system is authorized to purchase the property, privileges and franchises of the Elevated upon the terms and under the conditions herein set forth, such sale and purchase, if made, to take effect on the first day of July, nineteen hundred and twenty-eight.

The Elevated shall, prior to the fifteenth day of October, nineteen hundred and twenty-seven, hold a meeting of the holders of its first preferred, second preferred, preferred and common stocks, specially called for the purpose, to vote upon the question whether the Elevated shall so sell its property, privileges and franchises to the new company upon the terms and in the manner herein set forth. If such sale is so authorized by the holders of not less than a majority in amount of the capital stock of the Elevated, including both the preferred stock of all classes and the common stock voting thereon at such meeting, a certificate evidencing such action shall be filed by the Elevated with the secretary of the Commonwealth and said sale and purchase shall be made as authorized.

If the said sale is not so authorized by the holders of at least a majority in amount of the capital stock of the Elevated, including both the preferred stock of all classes and the common stock voting thereon at such meeting, then the new company shall thereupon be dissolved and its corporate franchise and existence terminated, and the new company and the board of incorporators shall cease to exist and all powers, privileges and authority of the new company and of the incorporators shall cease and determine and all authority hereunder to the Elevated and to the new company to make said sale and purchase shall cease.

SECTION 4. The new company is authorized to create and issue its capital stock in such amounts as may be necessary to carry out the provisions of this act. Such stock shall consist of shares of the par value of one hundred dollars each and shall be divided into preferred stock and common stock. Preferred stock issued under and to carry into effect the provisions of this act shall be entitled out of the net profits of the corporation to cumulative semi-annual preferential dividends from July first, nineteen hundred and twenty-eight, when, as and if declared by the board of directors, at the rate of four and one half per centum per annum, upon the par value thereof and no more, payable on the first days of January and July in each year to stockholders of record on such day not more than thirty days before the day on which

the dividend is payable as may be fixed by the board of directors. After all dividends accrued on the preferred stock have been paid or declared and set aside for payment but not otherwise dividends may be declared out of the balance of the net profits of the corporation upon the common stock and upon any other stock junior to the preferred stock in respect of rights to dividends. In case of dissolution or liquidation whether voluntary or involuntary, the holders of such preferred stock shall be entitled to the payment of the par value of their shares and all accrued and unpaid dividends before any payment is made to the holders of the common stock and the remainder of the assets of the new company shall be distributed among the holders of the common stock. Such preferred stock may be called by the new company as a whole or in part for payment on any semi-annual dividend date, at one hundred dollars per share and accrued and unpaid dividends, and shall have the same power of transfer as the common stock, but shall not be entitled to participate in any increase of issue of new stock, common or preferred, which may at any time be made by the new company. The common stock of the new company shall have the sole power of voting, provided, however, that such preferred stock shall have the same power of voting as the common stock if and as long as two semi-annual dividends on said preferred stock remain unpaid.

Warrants representative of the rights of the holder thereof to fractional parts of preferred and common shares may be issued by the new company in such amounts as may be necessary to carry out the provisions of this act. Such warrants shall pass by delivery but shall not entitle the holder thereof to dividends or to any other rights as a shareholder of the new company, and such holders shall be entitled upon surrender thereof to the new company on or before July first, nineteen hundred and twenty-nine, in multiples aggregating one or more whole shares to convert the same into whole shares of preferred or common stock of the new company, as the case may be. If such warrants are not so surrendered on or before July first, nineteen hundred and twenty-nine, the shares represented thereby may be sold

by the new company without notice, at public or private sale, and the proceeds thereof after deducting all expenses incurred in such sale shall be deposited as a part of the special trust fund created under the provisions of section thirteen of this act, and such warrants shall thereupon represent, and the holders thereof shall thereupon be entitled, subject to the provisions of sections thirteen and fourteen of this act, to such proceeds only.

SECTION 5. For the purpose of paying for all the property, privileges and franchises of the Elevated, the new company is hereby authorized to issue and deliver to the Elevated on July first, nineteen hundred and twenty-eight, an amount of its common stock equal in par value to the par value of the common stock of the Elevated at such date outstanding and an amount of its preferred stock equal in par value to the aggregate value of the first preferred stock taken at one hundred and twenty-five per share, second preferred stock taken at one hundred and ten per share and preferred stock taken at one hundred and five per share, of the Elevated at such date outstanding and the Elevated is hereby authorized to receive such stock in full payment for all such property, privileges and franchises subject to its existing indebtedness and liabilities as of such date of every kind whatsoever, including any and all liabilities in respect to all existing subway, tunnel, elevated and surface line leases and to the assumption of all such indebtedness and liabilities by the new company.

SECTION 6. The Elevated shall forthwith upon the final adjournment of the meeting provided for in section three of this act notify in writing all of its stockholders of the action taken thereat in respect to the sale of its properties, privileges and franchises as authorized in this act. If said sale shall have been authorized by at least a majority of all the stockholders of the Elevated voting thereon at said meeting, any stockholder of the Elevated who did not vote at said meeting, either in person or by proxy, in favor of the said sale may, within one hundred and twenty days after the date of said meeting, file with the bank or trust company duly appointed by the Elevated as the transfer agent of the class of stock held by him a writing addressed to the Elevated

declaring his opposition to the sale and stating his address, the number of shares held by him and the numbers of the certificates evidencing the same and shall at the same time present such certificates to such bank or trust company to be stamped with the words "non assenting".

Upon transfer thereafter of any shares evidenced by certificates so stamped "non assenting," the certificates for said shares issued to the transferee shall, in all cases be likewise stamped "non assenting." The holder of shares, certificates for which have been stamped "non assenting," shall at the time when the sale authorized by this act takes effect, receive in exchange, redemption and liquidation of such of said shares as shall be first preferred and second preferred stock, one hundred dollars per share in cash, for such of said shares as shall be preferred stock one hundred and five dollars per share in cash and for such of said shares as shall be common stock, the cash value of such shares as determined as provided in section seven of this act, and shall not be entitled to receive in such exchange, redemption and liquidation, any preferred or common stock of the new company. The Elevated shall cause the various banks and trust companies duly appointed as transfer agents of the shares of its capital stock at all times to keep a separate record of certificates outstanding stamped "non assenting" and of the shares represented thereby and a duplicate of such record shall be filed from time to time with the incorporators.

SECTION 7. The Elevated shall, not later than thirty days after the date of the stockholders' meeting provided for in section three of this act, file a petition in the supreme judicial court within and for the county of Suffolk setting forth the material facts and asking that the per share value of the common stock of the Elevated shall be determined. Thereupon the court shall pass an order appointing three commissioners to ascertain and report such value. The commissioners, after giving such notice by publication or otherwise as the court may order, shall hold public hearings at which the attorney general or an assistant attorney general shall represent the Commonwealth and at which common stockholders of the Elevated, the officers and directors of that

company and the board of trustees of the Elevated may be heard. The commissioners may summon witnesses, administer oaths and take testimony. The fees for such witnesses for attendance and travel shall be the same as for witnesses in the superior court. The commissioners in determining the per share value of the common stock of the Elevated under the provisions of this section shall neither increase nor diminish such value because of the provisions of this act or of the purchase and sale herein provided for.

On or before the first day of April, nineteen hundred and twenty-eight, but not earlier than the first day of March, nineteen hundred and twenty-eight, the commissioners shall report their determination to the court in writing, and after the giving of such notice with respect thereto as the court may order, the court shall approve the same unless some error of law be made to appear therein, in which event the matter shall be recommitted to the commissioners with such order as the court may make. Upon approval by the court, the determination of the commissioners shall be final and conclusive on all persons in respect to the per share value of the common stock of the Elevated for all purposes of this act. In case any vacancy shall at any time occur by reason of the death, resignation or inability to serve of any commissioner, his successor shall be appointed in the manner above provided for the original appointment of the commissioners. Any determination of the majority of the commissioners shall constitute the action of the commissioners with the same effect as though assented to by all. The compensation and expenses of the commissioners as approved by the court shall be assessed upon and paid by the Elevated.

Section 8. Upon the taking effect of the purchase and sale of the property, privileges and franchises of the Elevated as provided for in this act, and upon the delivery by the new company to the Elevated of certificates for new company preferred and common stock at the time, in the amounts and in the manner provided in section five of this act, and when the same shall have been so received by the Elevated, all the property, privileges and franchises of the Elevated of every kind whatsoever, excluding the special trust fund created

under the provisions of section nine of chapter seven hundred and forty of the acts of nineteen hundred and eleven, but including all beneficial interest of the Elevated in said special trust fund by virtue of the provisions of said chapter seven hundred and forty of the acts of nineteen hundred and eleven, shall belong to and become vested in the new company, and the new company shall thereupon assume and be responsible for all subway, tunnel, elevated and surface line leases existing at such date and all other indebtedness and liabilities of the Elevated of every kind whatsoever, without any further or other conveyance, assignment, transfer, deed, agreement or writing of either company to the other and the new company shall, in respect to the construction, operation and maintenance of street railways, subways, tunnels, elevated railways, surface lines, bus lines and any other transit facilities, succeed to all the powers, privileges, immunities, exemptions, rights and franchises and be subject to all the duties, obligations, restrictions and liabilities of the Elevated so far as the same are not inconsistent with this act and subject likewise to all general laws relating to street railways not inconsistent therewith or with this act. The new company may file in the registry of deeds and with the land court for any county and with the clerk or other proper officer of any cities and towns in any of which any property vested in the new company by the provisions of the act is situated a copy of this act, duly authenticated, together with a copy of the certificate required by the provisions of section three of this act, to be filed with the secretary of the Commonwealth by the Elevated, duly authenticated by said secretary of the Commonwealth and notwithstanding the foregoing provisions of this section the Elevated shall execute such documents and writings in terms in accord with the provisions of this act as the new company shall request.

SECTION 9. Upon the taking effect of the purchase and sale authorized by section three of this act, all rights given holders of the first preferred stock and second preferred stock of the Elevated by virtue of the provisions of chapter seven hundred and forty of the acts of nineteen hundred and

eleven, to convert such stock into common stock of the Elevated shall cease and the corporate franchises of the Elevated shall be revoked and the corporation thereupon dissolved and it shall only continue its corporate existence for the purpose of winding up and liquidating its affairs, and the Elevated shall forthwith make application to the supreme judicial court to appoint a liquidator (hereinafter sometimes called the "Liquidator") to take charge of its estate and effects and the special trust fund created under the provisions of section nine of chapter seven hundred and forty of the acts of nineteen hundred and eleven, and to do all other acts necessary for the final settlement of its unfinished business and to have all powers necessary to accomplish the same including all powers granted by section fifty-two of chapter one hundred and fifty-five of the General Laws not inconsistent with the provisions of this act. The new company shall be liable for and shall pay all costs, charges and expenses of the liquidator and all those incident to his appointment and discharge in such amounts as may be determined by the court in such proceedings.

SECTION 10. The liquidator shall upon his appointment administer the special trust fund created under the provisions of section nine of chapter seven hundred and forty of the acts of nineteen hundred and eleven in such manner as may be ordered by the supreme judicial court, and the new company shall apply any amounts paid to it on account of its beneficial interest therein to any purpose for which the new company may legally issue its stocks and bonds.

SECTION 11. The liquidator shall forthwith upon his appointment, distribute to the stockholders of the Elevated, except such holders of stock thereof as shall hold certificates therefor stamped "non assenting", the shares of the preferred and common stock of the new company delivered to the Elevated as provided in this act, by delivering to each of such holders of first preferred stock, second preferred stock and preferred stock of the Elevated, shares of the preferred stock of the new company in the following amounts, to wit:— one and one quarter shares of such stock for each share of first preferred stock of the Elevated; one and one tenth

shares of such stock for each share of second preferred stock of the Elevated and one and one twentieth shares of such stock for each share of preferred stock of the Elevated together with all dividends declared and paid thereon to such time of delivery, and by delivering to each of such holders of common stock of the Elevated an amount of the common stock of the new company equal in par value to the par value of the common stock of the Elevated held by them, together with all dividends declared and paid thereon to such time of delivery, upon the surrender by such holders of their certificates for such shares of stock to the liquidator, who shall cause the same to be cancelled.

SECTION 12. The liquidator shall forthwith upon his appointment, sell at public or private sale a par amount of the preferred and common stock of the new company received by the Elevated as provided in this act equal as respects such preferred stock so received, to the aggregate of one hundred and twenty-five per cent of the par amount of first preferred stock plus one hundred and ten per cent of the par amount of the second preferred stock plus one hundred and five per cent of the par amount of the preferred stock of the Elevated shown on the records of the clerk of the Elevated, kept in accordance with the provisions of this act, to have been stamped "non assenting", and as respects such common stock so received to the par amount of common stock of the Elevated shown on such records of such clerk, to have been stamped "non assenting", and shall distribute the proceeds of such sale to such holders of stock of the Elevated so stamped "non assenting" upon their surrender to him of their certificates therefor as respects such first preferred stock and second preferred stock so stamped "non assenting" in the amount of one hundred dollars and as respects such preferred stock so stamped "non assenting" in the amount of one hundred and five dollars for each share so surrendered and as respects such common stock so stamped "non assenting", in an amount equal to the per share value of common stock of the Elevated determined as provided in section seven of this act, for each share so surrendered. All cer-

tificates for shares so surrendered to the liquidator shall be cancelled by him.

If the proceeds of such sale shall not be sufficient to allow the liquidator to make full distribution in the amounts as above provided, he shall notify the new company of the amount needed by him in addition to the proceeds of such sale to allow him to make distribution in the amounts as above provided and shall request payment to him by the new company of such amount, which such company shall forthwith make and if the proceeds of such sale shall exceed the amount necessary to make such full distribution the liquidator shall forthwith pay any such excess into the general funds of the new company.

The liquidator shall pay to the new company within thirty days after July first, nineteen hundred and twenty-nine, any balance of the proceeds of such sale then remaining in his hands undistributed, to be held by the new company as a special trust fund from which payments shall be made to holders of certificates for stock of the Elevated stamped "non assenting" in the same amount as provided above for payments to be made by the liquidator to such stockholders upon their surrendering such certificates to the treasurer of the new company, who shall cancel the same. Such holders of certificates of stock of the Elevated so stamped "non assenting" shall look only to such special trust fund, upon its establishment, for liquidation, redemption and payment of such stock in the manner aforesaid.

The new company may, subject to the approval of the department of public utilities, issue its bonds, notes or stock at par or less than par to such amount as may be necessary to reimburse its treasury for any payment made to the liquidator under the provisions of this section.

SECTION 13. The liquidator shall within ninety days after July first, nineteen hundred and twenty-nine, sell at public or private sale all shares of the common and preferred stock of the new company then remaining in his hands undistributed and shall deposit the proceeds of such sale, together with any amount received by him prior to such sale as dividends on such stock, with the new company to be held by it

as a special trust fund and upon and after such sale all rights of the holders of stock of the Elevated, other than holders of certificates therefor stamped "non assenting", to exchange such stock for stock of the new company as provided in this act, or to receive any dividends declared and paid on such stock of the new company, shall cease and determine, and thereafter, such stockholders shall look only to such special trust fund so deposited with the new company for the liquidation, redemption and payment of such stock in the manner in this section provided.

The treasurer of the new company shall make payments from such fund to holders of stock of the Elevated other than holders of certificates for such stock stamped "non assenting", upon surrender of their certificates to him and the cancellation of the same by him, of an amount per share in cash as respects the first preferred stock of the Elevated equal to the amount secured by the liquidator at such sale for one and one quarter shares of the preferred stock of the new company so sold and as respects the second preferred stock of the Elevated equal to the amount secured by the liquidator at such sale for one and one tenth shares of the preferred stock of the new company so sold and as respects the preferred stock of the Elevated equal to the amount secured by the liquidator at such sale for one and one twentieth shares of the preferred stock of the new company so sold, plus in the same ratio any dividends on such preferred stock of the new company so sold received by the liquidator prior to such sale, and as respects the common stock of the Elevated, equal to the amount per share secured by the liquidator at such sale for the common stock of the new company so sold plus any dividends thereon received by the liquidator prior to such sale.

Upon the deposit in such fund of the proceeds from the sale by the new company of its preferred and common stock represented by fractional warrants pursuant to the provisions of section four of this act, the treasurer of the new company shall make payment from such fund to holders of warrants representative of fractions of shares of preferred and common stock of the new company upon surrender of

such warrants to him and the cancellation of the same by him of an amount per warrant in cash equal to the amount deposited in such fund as the proceeds from the sale of the fraction of a share represented by such warrant.

SECTION 14.   The special trust funds provided for in sections twelve and thirteen of this act shall be used only for the purposes set forth in said sections and in section four, respectively, and until such use, may be invested by the new company in income-producing securities and allowed to accumulate.   Any balance of principal of such funds with their accumulations remaining undistributed on July first, nineteen hundred and forty-eight, shall be transferred to the general funds of the new company and upon such transfer all claims and rights of every kind whatsoever, of holders of certificates for stock of the Elevated, whether or not stamped "non assenting", and of holders of warrants representative of fractions of shares of preferred and common stock of the new company in respect to such stock or such warrants, as the case may be, and in respect to such funds, shall cease and determine.

The liquidator shall, on January second, nineteen hundred and twenty-nine, notify in writing, all holders of certificates for stock of the Elevated, whether or not stamped "non assenting", who have not presented their certificates for exchange for stock of the new company or cash as the case may be as provided in this act of the substance of the provisions of sections eleven to fourteen of this act, inclusive.

SECTION 15.   The incorporators shall call the first meeting of the stockholders of the new company, to be held on October fifteenth, nineteen hundred and twenty-nine, or earlier, upon the incorporators receiving written notice from the liquidator to the effect that he has completed the distribution of the preferred and common stock of the new company as provided in this act, by a notice signed by the chairman of the incorporators stating the time, place and purpose of the meeting.   A copy of such notice shall be given by the clerk of the incorporators at least seven days before such meeting to each stockholder by leaving such notice with him or at his residence or usual place of business or by mailing

it postage prepaid, addressed to each stockholder at his
address as it appears upon the books of the new company.

SECTION 16. At such first meeting of the stockholders or
at any adjournment thereof, the stockholders shall organize
by the adoption of by-laws not inconsistent with the pro-
visions of this act, and by the election by ballot of a board of
not less than nine directors, a clerk who shall be sworn, and
such other officers and such agents as the by-laws shall
authorize. The clerk of the incorporators shall make and
attest a record of the proceedings until a clerk of the new
company has been chosen and sworn including a record of
such choice and qualification.

SECTION 17. The new company may issue bonds, coupon
notes or other evidences of indebtedness payable at periods
of more than one year after their date, for any necessary and
lawful corporate purposes, to an amount which, including
the amount of all such securities previously issued and
outstanding, computed as provided in section fifty-three of
chapter one hundred and fifty-nine of the General Laws,
does not exceed by more than one hundred and fifty per
cent the aggregate of the par value of the capital stock of the
new company of both classes issued to purchase the Elevated,
pursuant to the provisions of this act plus the amount ac-
tually paid to the new company on its capital stock of all
classes subsequently issued at the time actually paid in,
subject to the prior authorization of the issue of such bonds,
notes and other evidences of indebtedness by the depart-
ment of public utilities.

SECTION 18. A board of trustees of the metropolitan
transit system (hereinafter sometimes called the "trustees")
is hereby created, to be appointed by the governor with the
advice and consent of the council, and to consist of a chair-
man to be appointed for the term of ten years and four other
trustees to be appointed for the terms of two, four, six, and
eight years respectively from July first, nineteen hundred
and twenty-eight, and thereafter as the terms of the trustees
so appointed expire, their successors shall be appointed in
like manner for terms of ten years each but not exceeding the
period of public control and operation. The persons so

appointed shall be sworn before entering upon the performance of their duties, and shall own no stock or other securities of the Elevated or of the new company or of any company owned, leased or operated thereby. The chairman shall receive fifteen thousand dollars annually, and each of the other trustees shall receive five thousand dollars annually from the new company as compensation for their services. Each trustee so appointed shall take office upon his appointment and qualification and in case of any vacancy in the trustees by reason of death, resignation or otherwise, the governor, with the advice and consent of the council, shall fill the same. The chairman shall be the executive and administrative head of the trustees and shall organize the work of the trustees as he may from time to time determine. The chairman and any two other trustees shall constitute a quorum for the transaction of business and the action of a majority of those present at a meeting, provided the chairman be included in such majority, shall be deemed the action of the trustees. Any trustee may be removed for cause by the governor, with the consent and advice of the council. The trustees shall not be considered public officers within the meaning of section forty, chapter two hundred and seventy-one of the General Laws, but shall be subject in all other respects to the provisions of said section, to the same extent as are the directors of the new company, but said section shall not apply to recommendations by the governor to the trustees. The provisions of section three of chapter twelve of the General Laws shall not apply to the trustees but the attorney general shall upon the request of the trustees advise them upon important questions of law.

SECTION 19. The board of directors of the new company shall, during the period of public control and operation, have no control over the management and operation of the new company, but its duties shall be confined to maintaining the corporate organization, protecting the interest of the new company so far as necessary and taking such action from time to time as may be deemed expedient in cases, if any, where the trustees cannot act in its place. Such sum as may be deemed reasonable shall be allowed to the board of

MASS.]

directors each year by the trustees, to provide for the maintenance of the corporate organization of the new company and the performance of such duties as may be necessary by the new company and the directors.

SECTION 20. The trustees, and their successors, shall manage and operate the new company and the properties owned, leased or operated by it, until July first, nineteen hundred and seventy-eight, and, subject to the provisions of this act, shall take and have possession of said properties in behalf of the Commonwealth during the period of public control and operation and, for the purpose of this act, shall, except as is otherwise provided in this act, have and may exercise all the rights and powers of said new company and its directors, and, upon behalf of said new company, shall receive and disburse its income and funds. They shall have the right to appoint and remove in their discretion the president, treasurer and clerk of the new company and all officers thereof other than the board of directors. They shall have the right to regulate and fix fares, and charges for any service operated or furnished including the issue, granting and withdrawal or transfers, and the imposition of charges therefor, and shall determine the character and extent of the service and facilities to be furnished, and in these respects their authority shall be exclusive and shall not be subject to the approval, control or direction of any other state board or commission.

In the management and operation of the new company and of the properties owned, leased or operated by it, as authorized by this act, the trustees and their agents, servants and employees shall be deemed to be acting as agents of the new company and not of the Commonwealth and the new company shall be liable for their acts and negligence in such management and operation to the same extent as if they were in the immediate employ of the new company but the trustees shall not be personally liable.

SECTION 21. The trustees shall have authority to make contracts in the name and on behalf of, the new company and subject to the approval of the department of public utilities and to such requirements as to amortization as said

department may prescribe, the trustees may issue and dispose of stocks, bonds, notes and other evidences of indebtedness of the new company at par or less than par, and may dispose of any preferred stock issued without offering the same to the stockholders. No. contract for the operation or lease of any subways, tunnels, elevated or surface lines in addition to those owned, leased or operated by the Elevated at the time of the taking effect of the purchase authorized by section three of this act, or any extensions thereof beyond their then limits, shall be entered into which shall involve the payment of any rental or other compensation by the new company beyond the period of public control and operation without the consent of the directors of the new company, but surface lines may be constructed or purchased beyond the limits of surface lines existing at such time after the consent of the directors has been refused, if the trustees shall determine, after a public hearing, that public necessity and convenience require such construction or purchase; provided, however, that if the Commonwealth shall elect under the provisions of section thirty-two of this act, to discontinue the public control and operation of the new company's property, no such surface lines shall thereafter be constructed or purchased without such consent. The trustees shall cause to be paid all amounts which may from time to time become due from the company, and shall declare dividends at the appointed times upon the preferred and common stock of the new company, and provide for the payment of the same.

SECTION 22. Unless and until the trustees of the new company shall be appointed as provided in section eighteen of this act, the board of trustees of the Boston Elevated Railroad Company, as such board may be constituted on July first, nineteen hundred and twenty-eight, shall be and become the trustees of the new company with all the rights, powers and duties granted the trustees of the new company under the provisions of this act.

SECTION 23. The trustees shall from time to time, fix such rates of fare and schedules of charges for services furnished or operated as will reasonably insure sufficient

income to meet the cost of the service, which shall include operating expenses, taxes, rentals, interest on all indebtedness, an annual sum of eight hundred thousand dollars representing the saving in the amount of dividend charges brought about by the purchase and sale provided for in this act and the creation of the new company, such allowance as they may deem necessary or advisable for depreciation of property and for obsolescence and losses in respect to property sold, destroyed or abandoned, all other expenditures and charges which under the laws of the Commonwealth now or hereafter in effect may be properly chargeable against income or surplus, the fixed dividends on all preferred stock of the new company from time to time outstanding, and dividends on the common stock of the new company from time to time outstanding at the rate of five per cent per annum on the par value thereof during the period of public control and operation. Dividends upon the common shares shall be payable quarterly, but no dividends shall be paid upon such common shares in excess of the rates herein specified.

SECTION 24. Any amounts that may be in the reserve fund established under the provisions of section five of chapter one hundred and fifty-nine of the acts of nineteen hundred and eighteen at the time of the taking effect of the purchase and sale authorized by section three of this act shall continue to be set aside as a reserve fund by the new company, and shall be used only for purposes of making good any deficiency in income as provided in section twenty-six of this act or for reimbursing the Commonwealth as provided in sections twenty-five and thirty of this act and until so used may be invested in income producing securities and any such investment made during the period of public control and operation shall be made in the discretion of the trustees and all income or interest received thereon shall be treated as part of the general income of the new company.

SECTION 25. The trustees shall from time to time fix and put in operation rates of fare and schedules of charges for all services furnished or operated which in their judgment will produce sufficient annual income to meet the cost of

service, as defined in section twenty-three of this act, without reduction of the reserve fund below the amount thereof as originally established under the provisions of section five of chapter one hundred and fifty-nine of the acts of nineteen hundred and eighteen.

If at any time the trustees shall be of opinion that said rates of fare or schedules of charges should be changed either with regard to the method or basis upon which the fares and transfer privileges or schedules of charges are established, or because the same or any of them are too small or too great, or for any other reason, the trustees may adopt and put into effect new rates of fare or schedules of charges which in their judgment will provide sufficient annual income to meet the cost of service, as defined in section twenty-three of this act without impairment of the amount of the reserve fund.

It shall be the duty of the trustees to maintain the property of the new company in good operating condition and to make such provision for depreciation, obsolescence and rehabilitation, that, upon the expiration of the period of public control and operation, the property shall be in good operating condition. If the period of public control and operation expires, control of the property shall then revert to the new company, and if at that time the amount of the reserve fund shall be less than the amount of the reserve fund as originally established under the provisions of chapter one hundred and fifty-nine of the acts of nineteen hundred and eighteen because the income during the period of public control and operation has been insufficient to pay the cost of the service as defined in this act, the Commonwealth shall forthwith pay over to the new company an amount sufficient to restore it to an amount equal to such original amount; and if the amount in the reserve fund is then in excess of the amount of the reserve fund as originally established as aforesaid plus any amount required to meet the cost of the service as defined as aforesaid to the expiration of such period, such excess shall be paid into the treasury of the Commonwealth and distributed among the cities and towns in which the company operates in the same proportions as the assessments provided for by section thirty-one of this act; provided,

however, that in the event of the exercise by the Common‑ wealth of the option contained in section thirty-five of this act, or of taking by eminent domain, such excess may be used toward payment of the purchase price.

SECTION 26. Whenever the income of the new company is insufficient to meet the cost of the service as defined in this act the reserve fund shall be used as far as necessary to make up such deficiency and whenever on the other hand such income is more than sufficient to meet the cost of service, the excess shall be transferred to and become a part of the reserve fund.

SECTION 27. The sum of eight hundred thousand dollars, annually included as provided in section twenty-three of this act in the cost of service, shall be annually disbursed by the new company in such amounts and at such times as may be necessary to enable payments to be made as follows: —

(a) An annual payment to the Commonwealth of two hundred thousand dollars to be made on the fifteenth day of April of each year as provided in section twenty-eight of this act;

(b) An annual payment to the Commonwealth of four hundred thousand dollars, or such portion of such sum as shall be necessary in order to repay to the Commonwealth amounts paid by the Commonwealth to the Elevated under the provisions of chapter one hundred and fifty-nine of the acts of nineteen hundred and eighteen, to be made in the manner provided in section thirty of this act;

(c) Any portion of such sum remaining after making the above-mentioned payments to the Commonwealth shall be used by the new company for the payment of rentals and other fixed charges in respect to subways, tunnels, elevated and surface lines, and other improved transportation facilities, if any, operated in addition to those operated by the Elevated at the time of the taking effect of the purchase and sale pro‑ vided for in section three of this act and any amounts thereof not so used during any fiscal year of the new company shall be added to the amount to be paid the Commonwealth under subparagraph (b) of this section so long as any amounts are to be so paid to the Commonwealth and thereafter shall be

added to the amount to be paid to the Commonwealth under subparagraph (*a*) of this section.

SECTION 28. Nothing in this act shall be held to affect the right of the Commonwealth or any subdivision thereof to tax the new company or its stockholders in the same manner and to the same extent as if the new company had continued to manage and operate its own property; provided, however, that during the period of public control and operation, the corporation franchise tax assessed against the new company under chapter sixty-three of the General Laws shall be refunded to the new company to the extent that such tax exceeds in amount the franchise tax assessed against the Elevated for the year nineteen hundred and twenty-six.

The annual payments to be made to the Commonwealth under the provisions of subparagraph (*a*) of section twenty-seven of this act, together with the income therefrom, shall be held by the Commonwealth as a special trust fund but shall be administered by the trustees and shall be invested from time to time, in the discretion of the trustees, in the preferred stock of the new company issued as provided in this act in acquisition of the property, privileges and franchises of the Elevated by purchase of such preferred stock either on the open market or by causing the same to be called at par and until and unless so used shall be invested by the trustees in such securities as are legal investments for savings banks in this Commonwealth. When so purchased such preferred stocks shall be held in the name of the Commonwealth and shall continue to receive dividends, which dividends shall be paid into such special trust fund. Upon the expiration or termination of the period of public control and operation, such preferred stock and other securities so purchased shall be administered by the governor with the advice and consent of the council for the benefit of the car riders of the new company until the general court shall determine the permanent disposition thereof.

SECTION 29. If, as of the last day of June in any year, the amount of the reserve fund shall exceed its amount as originally established under the provisions of chapter one hundred and fifty-nine of the acts of nineteen hundred and

eighteen by not less than two million dollars and the income shall have exceeded the cost of service as defined in this act in each of the two preceding twelve months' periods by not less than one million dollars, the trustees shall, within three months thereafter, put into effect a reduction in the schedules or rates of fare; and if, as of such date, the amount of the reserve fund shall be less than thirty per cent of its amount as originally established as aforesaid and during the preceding twelve months the income has been less than the cost of service as defined in this act the trustees shall, within one month thereafter, put into effect a higher schedule or rate of fare. Nothing herein shall impair the authority given by section twenty-five of this act. In determining the amount of the reserve fund, for the purpose of this section only, there shall first be deducted therefrom any amounts which have been paid by the Commonwealth to the new company under the provisions of section thirty of this act, and for which the Commonwealth has not been reimbursed.

SECTION 30. Whenever as of the last day of any June during the period of public control and operation, the amount remaining in the reserve fund shall be insufficient to meet the deficiency mentioned in section twenty-six of this act, it shall be the duty of the trustees to notify the treasurer and receiver general of the Commonwealth of the amount of such deficiency less the amount, if any, in the reserve fund and the Commonwealth shall thereupon pay over to the new company the amount so ascertained. Pending such payment, it shall be the duty of the trustees to borrow such amount of money as may be necessary to enable them to make all payments including dividend payments as they become due.

If as of the last day of any June during the period of public control and operation the reserve fund shall be in excess of its amount as originally established under the provisions of chapter one hundred and fifty-nine of the acts of nineteen hundred and eighteen, the trustees shall apply the excess so far as necessary to reimbursing the Commonwealth for any amounts which it may have paid to the new company under the provisions of this section and the Commonwealth shall thereupon distribute the amount so received among the cities

and towns in which the new company operates in proportion to the amounts they have respectively been assessed as provided in section thirty-one of this act.

Until the Commonwealth shall have been repaid any amounts paid by it to the Elevated under the provisions of chapter one hundred and fifty-nine of the acts of nineteen hundred and eighteen, the trustees shall pay to the treasurer and receiver general of the Commonwealth on the last day of each fiscal year of the new company during the period of public control and operation, any funds available under the provisions of subparagraph (b) of section twenty-seven of this act for payment to the Commonwealth and the Commonwealth shall thereupon distribute the amount so received among the cities and towns in which the new company operates, in proportion to the amounts which they have respectively been assessed under the provisions of said chapter one hundred and fifty-nine of the acts of nineteen hundred and eighteen until all amounts so assessed thereunder have been repaid.

In order to meet any payments required of the Commonwealth under the provisions of this section, the treasurer and receiver general may borrow at any time, in anticipation of the assessments to be levied upon the cities and towns under the provisions of section thirty-one of this act, such sums of money as may be necessary to make said payments and shall repay any sums so borrowed as soon after said assessments are paid as is expedient.

Section 31. In case the Commonwealth shall be called upon to pay to the trustees or the new company any amount under the provisions of sections twenty-five and thirty of this act, such amount with interest or other charges incurred in borrowing money for the purpose, shall be assessed upon the cities and towns in which the new company operates by an addition to the state tax next thereafter assessed in proportion to the number of persons in said cities and towns using the service of the new company at the time of said payment, said proportion to be determined and reported to the treasurer and receiver general by the trustees from computations made in their discretion for the purpose.

SECTION 32.  Notwithstanding anything contained in this act, the public control and operation of the new company shall continue after July first, nineteen hundred and seventy-eight, upon the terms and conditions herein specified until such time as the Commonwealth shall elect to discontinue such public control and operation.  The Commonwealth shall have the right to terminate such public control and operation, either on said date or at any time thereafter by appropriate legislation passed not less than two years before the date fixed for such termination.

SECTION 33.  Upon the expiration or termination of the period of public control and operation, the new company shall control and operate the property and may fix and collect such just and reasonable fares as will produce an income sufficient to pay the reasonable cost of the service as defined in section twenty-three of this act, excluding the sum of eight hundred thousand dollars included in the cost of service defined as aforesaid but including dividends upon the common stock from time to time outstanding of six per cent per annum on the par value thereof but no more, and may establish schedules of fares and charges for any service operated or furnished which shall automatically increase or decrease in the same manner as is authorized in the case of the trustees; provided, that the Commonwealth shall be under no liability to make any payments to the new company by reason of any deficiencies in income accruing after the discontinuance of public control and operation.  The new company shall thereafter be subject to public regulation and supervision in such manner as may be determined by the general court, but such regulation and supervision shall not be exercised so as to reduce the income below the reasonable cost of the service as defined in this act, excluding therefrom the said sum of eight hundred thousand dollars, but including therein dividends upon the common stock from time to time outstanding of six per cent per annum.

SECTION 34.  The Commonwealth hereby contracts with the new company and each of the holders of the preferred stock of the new company, issued as provided in this act for the purpose of acquiring the property, privileges and fran-

chises of the Elevated, to purchase such preferred stock either from time to time during the period of public control and operation, in the manner provided in section twenty-eight of this act or in any event at the par value thereof upon the expiration or termination of said period of public control and operation but such contract of the Commonwealth shall not include or apply to any preferred stock of the new company issued subsequent to the time of such acquisition by the new company of the property, privileges and franchises of the Elevated.

SECTION 35. The acquisition of all the property, privileges and franchises of the Elevated by the new company as provided in this act shall constitute an acceptance of this act by the new company and an agreement upon its part to sell to the Commonwealth at any time during the period of public control and operation, its whole assets, property and franchises as a going concern upon the assumption by the Commonwealth of all its outstanding indebtedness and liabilities and the payment to the new company of an amount in cash equal to the aggregate of the following, viz:

(a) The total par value of the preferred stock of the new company issued under the provisions of this act at such time outstanding, plus

(b) An amount equal to the total value taken at one hundred and two and one half dollars per share of the capital stock of the new company then outstanding of all classes other than preferred stock issued under the provisions of this act, plus

(c) The total amount of premiums paid in on the capital stock of the new company of all classes subsequent to the taking effect of the purchase and sale provided for in this act.

Such purchase shall effect a dissolution of the new company subject, however, to the provisions of section fifty-one of chapter one hundred and fifty-five of the General Laws and the Commonwealth shall thereupon succeed to all the right, title and interest of the new company in and to the special trust fund established by section nine of chapter seven hundred and forty of the acts of nineteen hundred and eleven.

The provisions of this section shall not preclude the Commonwealth or any political subdivision thereof from acquiring the property and franchises of the new company at any time through the exercise of the power of eminent domain, and in the event of such taking the compensation to be paid to the new company shall not be enhanced by reason of the passage of this act or of any contract made pursuant to the terms of this act.

SECTION 36. With the exception of sections one and two, which shall take effect upon the passage of this act, this act shall take effect upon its acceptance by the holders of at least a majority in amount of the capital stock of the Elevated voting thereon at the meeting of stockholders provided for in section three of this act and the filing by the Elevated of a certificate of such acceptance with the secretary of the Commonwealth.

None of the provisions of this act shall be construed to constitute a contract binding upon the Commonwealth other than the provisions which define the period of public control and operation, and the terms and conditions under which, during such period, the property owned, leased or operated by the new company shall be controlled and operated by the trustees; the provisions of section twenty-five and the provisions of sections twenty-eight and thirty-four with respect to the purchase by the Commonwealth of the preferred stock of the new company, all of which above-mentioned provisions shall constitute a contract binding upon the Commonwealth.

On November 22, 1927, the Justices returned the following answer:

To The Honorable the House of Representatives of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to the questions contained in the order adopted on the twenty-fifth day of April, 1927. Those questions relate to pending bills concerning public control of the Boston Elevated Railway system which if enacted

affect or amend Spec. St. 1918, c. 159, and to other kindred matters. Copy of the order is hereto annexed.

The first question in substance is whether it is constitutionally competent for the General Court to empower the Boston Elevated Railway Company to sell its property to a new corporation to be chartered for the purpose of acquiring the same, if such sale is authorized by the holders of not less than a majority in amount of the capital stock of the Boston Elevated Railway Company, including the preferred stocks of all classes and the common stock, as provided in bill, House No. 522.

The Boston Elevated Railway Company is a public service corporation. Its chief corporate purpose is to afford carriage of passengers for hire within parts of Boston and nearby cities and towns by means of cars moved mainly by electricity on and through elevated structures, subways, tunnels and surface street railway tracks and other means adapted to that end. It cannot sell or alienate its rights and properties without legislative permission. The nature of its business is public. Its management and operation have been taken over by the Commonwealth as a public enterprise and exercised through a board of public officers called trustees. Spec. St. 1918, c. 159. The validity of that statute was upheld against certain attacks founded upon its alleged unconstitutionality in *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, affirmed in 260 U. S. 309, and in *Chelsea* v. *Treasurer & Receiver General*, 237 Mass. 422. See *Opinion of the Justices*, 231 Mass. 603. What is there decided is accepted without repeated references as the basis of this opinion and goes far toward answering the questions here presented.

The power of the General Court over ordinary domestic corporations is broad. They cannot come into existence except by legislative sanction. Since St. 1831, c. 81, it has been provided that every act of incorporation thereafter enacted shall be subject to amendment, alteration or repeal by the General Court. This statute long ago was extended to corporations chartered under general law. Its present terms are found in G. L. c. 155, § 3. There are limitations to

the exercise of this reserved power, but they do not seem to be germane to the question because the operative force of the proposed statute is optional upon its acceptance by the Boston Elevated Railway Company. It is not compulsory. Such limitations, therefore, need not be examined. See *Commonwealth* v. *Essex Co.* 13 Gray, 239, 252; *Central Bridge Corp.* v. *Lowell,* 15 Gray, 106, 117; *Superior Water, Light & Power Co.* v. *Superior,* 263 U. S. 125. Since the Boston Elevated Railway Company is a corporation organized under special statute for the performance of an important public service having relation to the general welfare, the power of the Legislature over it is extensive. Such a company may be empowered by the General Court to sell all its property to another similar public service corporation, when approved by a majority vote in amount of its capital stock including all classes of its stockholders both preferred and common. The new corporation, as provided by proposed bill, House No. 522, will be a corporation organized for the performance of functions similar to those of the Boston Elevated Railway Company for the benefit of the public, and although privately owned, it is to be managed and controlled by a board of public officers. Numerous statutes have been enacted authorizing the consolidation, sale and lease of steam railroads and street railways. The power of the General Court to this end is well established. *Hale* v. *Cheshire Railroad,* 161 Mass. 443. *Federal Trust Co.* v. *Bristol County Street Railway,* 222 Mass. 35. *Brown* v. *Boston & Maine Railroad,* 233 Mass. 502. *Proprietors of Locks & Canals on Merrimack River* v. *Boston & Maine Railroad,* 245 Mass. 52. It is constitutionally competent for the General Court to enact a statute of that tenor under the power conferred upon it by c. 1, § 1, art. 4, of the Constitution to make, ordain and establish all manner of wholesome and reasonable laws and statutes.

We answer "Yes" to question 1.

The second question relates to the power of the General Court under the Constitution to authorize the Boston Elevated Railway Company to dissolve and liquidate its affairs as provided in said proposed bill, House No. 522, with

special reference to the votes of stockholders framed to accomplish that result. There appear to be four classes of stock in the Boston Elevated Railway Company consisting of three kinds of preferred and the common stock. The first and second preferred stocks were authorized by St. 1911, c. 740, § 2, whereby it was enacted that "Said first and second preferred stock shall have the same power of voting . . . as said other [common] stock, and shall be counted with said common stock in all questions of majorities and quorums." It is plain that such stock came into existence upon these express statutory terms and the holders thereof can claim no rights in addition to those there stipulated. These two classes of stock stand upon the same footing touching all matters of voting on corporate affairs as does the common stock. The other class of preferred stock was authorized by Spec. St. 1918, c. 159, § 5. It was there described simply as preferred stock. No express provision was made in that statute respecting the voting power of this stock. It was provided however that it "shall be subject . . . to such preferences in liquidation, as the stockholders may determine, and shall be subject to retirement at the request of the trustees or after the period of public operation" at a stated price. We are not informed whether any such preferences have been determined by the stockholders, nor, if there are any, what they are. The rights of the holders of this stock with reference to voting are not specified. We are of opinion that therefore they are on the same basis in this particular as holders of the other two classes of preferred stock and of the common stock. *Hale* v. *Cheshire Railroad,* 161 Mass. 443, 445. It follows that under existing statutes all the stockholders are on an equality with respect to voting on the subject of sale of property and liquidation of the affairs of the railway company. There is no provision that in voting upon any questions the holders of the several classes of stock shall vote separately or as a unit, or have any special privileges or powers one over another.

It is a general principle of the administration of corporations that the majority in value of the stockholders declare the policy of the corporation in the absence of special pro-

visions to the contrary. *Treadwell* v. *Salisbury Manuf. Co.*
7 Gray, 393, 404, 405. *Durfee* v. *Old Colony & Fall River
Railroad*, 5 Allen, 230. *O'Brien* v. *O'Brien*, 246 Mass. 411,
420. *Thomas* v. *Laconia Car Co.* 251 Mass. 529, 534, 535.
*Boucher* v. *Hamilton Manuf. Co.* 259 Mass. 259. Unanimity
on the part of all stockholders as to corporate action is not
required by any principle of law. "Dissenting stockholders
are bound by the vote of the majority, acting in good faith
and within legislative sanction." *Hale* v. *Cheshire Railroad*,
161 Mass. 443, 445.

It is not within the charter powers of the Boston Elevated
Railway Company to sell its franchises, property and privi-
leges at the volition of its stockholders as provided in the
proposed bill. *Richardson* v. *Sibley*, 11 Allen, 65. *Clemons
Electrical Manuf. Co.* v. *Walton*, 206 Mass. 215, 221. *At-
torney General* v. *Boston & Albany Railroad*, 233 Mass. 460,
463, 464, and cases there collected. See G. L. c. 161, §§ 1–4.
The Boston Elevated Railway Company is authorized to
mortgage or pledge its franchise and property as security for
its bonds. St. 1894, c. 548, § 4, as amended by St. 1897,
c. 500, § 1. See St. 1912, c. 485; St. 1919, c. 369. That
authority does not justify a sale to a new corporation to be
chartered to take over its property. Whether a majority
or a larger proportion of all the stock of all classes is to be
required for a vote of the railway company to make sale of
its property as provided in bill, House No. 522, is a matter
to be determined by the General Court in accordance with
its conceptions of just and sound policy. No provision of
the Constitution demands one course rather than another
in this particular.

It is contemplated in the main by the provisions of this
proposed bill that there shall be a sale to the new company
of the property, privileges and franchises of the Boston
Elevated Railway Company if voted by its stockholders as
there set forth. The price to be paid is not in cash but in
stock of the new corporation. Whether such sale shall be
made upon the terms specified in § 5 is to be determined by
vote of a majority of the stockholders of the Boston Ele-
vated Railway. There is no taking under the power of

eminent domain by the new company of any stock in the old company or of any of its property. It is a simple bargain and sale between two corporations of property and franchises upon terms specified. The price to be paid by the new company to the Boston Elevated Railway Company for all its property, privileges and franchises, as provided in § 5 of the proposed bill, is the issuance and delivery of the stock of the new company for the outstanding stock of the Boston Elevated Railway Company as follows:· an amount of its common stock equal in par value to the par value of the common stock of the Elevated and an amount of its preferred stock equal in par value to the aggregate value of the first preferred stock taken at one hundred and twenty-five per share, second preferred stock taken at one hundred and ten per share, and preferred stock taken at one hundred and five per share. Whether a sale shall be made upon these terms is a matter of corporate policy to be determined by the stockholders of the Boston Elevated Railway Company. The proposed bill, House No. 522, in § 11 does not provide for an equal distribution of the shares of stock in the new company thus to be received among the stockholders of the Boston Elevated Railway Company. By its terms one and one quarter shares of such stock shall be issued for each share of the first preferred, one and one tenth shares of such stock for each share of the second preferred, one and one twentieth shares of such stock for each share of the preferred stock, and an amount of the common stock of the new company equal in par value to the common stock, held by each stockholder in the Boston Elevated Railway Company. To the holders of nonassenting first preferred and second preferred stock payment in cash is to be made under §· 12 for such stock at par value, which is $100 per share, see St. 1911, c. 740, § 2, and to holders of the preferred stock payment in cash at $105 per share, see Spec. St. 1918, c. 159, § 5. We assume, as appears to be assumed in the question, that this cash payment for preferred stock is in accordance with preference in liquidation determined by the stockholders in accordance with said § 5 and we make answer on this assumption but we have no information on this point.

The amounts of stock in the new company to be issued to assenting holders of the several classes of preferred stock in the Boston Elevated Railway Company are not on the footing of share for share nor in conformity to any existing statutory preferences but are on the footing of new preferences established by the proposed bill. This is the appearance of the proposed bill on its face and we have no other information concerning it. The provisions of this nature must be affirmed and approved by vote of the stockholders of the Boston Elevated Railway Company. The holders of the several classes of preferred stock who accept this provision of course have no right to complain. The holders of first and second preferred stock who do not assent to it cannot complain because they will receive the precise amounts in cash to which, under the terms of the governing statutes authorizing the issue of such stock, they are entitled in case of liquidation. Therefore the proposed bill, House No. 522, in §§ 11, 12 and 13 establishes a new kind of preference for the several classes of preferred stock (except perhaps the preferred stock issued under Spec. St. 1918, c. 159, § 5, as to which we have no information) over the common stock. Such preferences are unequal, when measured by par value of stock, with respect to holders of common stock who do not assent to the plan. Hence it is necessary to make some provision for the payment for such shares of common stock at their fair value or upon some just basis in order that it may be extinguished and the corporation liquidated.

The holders of common stock in the Boston Elevated Railway Company who accept the exchange for stock in the new company of course have no right to complain. The holders of such stock who do not accept such exchange have no right to complain because under §§ 6 and 7 of the proposed bill they will receive in cash the "per share value" of their stock as ascertained by judicial decision, which is equivalent to reasonable and just compensation therefor. No stockholder rightly can ask more than that for his shares in the final liquidation of a corporation. No owner of property can be compelled against his will to part with it at any price for a private purpose. *Riverbank Improvement*

*Co.* v. *Chadwick,* 228 Mass. 242. That principle is not applicable to this part of the proposed bill, which as a whole provides for the liquidation of a public service corporation pursuant to a vote of its stockholders in accordance with statutory authority upon fair terms.

The shares of common stock paid for in cash at the value thus ascertained are to be extinguished. One purpose of such extinguishment is to accomplish the complete and final liquidation of the Boston Elevated Railway Company. These parts of the plan all have reference to the promotion of the public welfare touching this transportation system. We are of opinion that the provisions of §§ 6 and 7 of the proposed bill, House No. 522, for the ascertainment of the per share value of the common stock and for the payment of such value to the holders of nonassenting shares in §§ 12 and 13 of the proposed bill are essential to its validity as a whole and cannot be eliminated.

The proposed bill makes provision for the liquidation of the Boston Elevated Railway Company, that is, for the sale and transfer of all its property, the payment of all its obligations and the extinguishment of all its stock, and the distribution of the remainder of what is received in payment for such sale or transfer among its stockholders. Liquidation of that company upon fair and just terms approved by vote of the stockholders as provided in the proposed bill is within the constitutional power of the General Court for reasons already given.

We answer "Yes" to subdivisions (a), (b) and (c) of question 2, and "No" to subdivision (d) of that question.

The inquiry presented by question 2A is whether upon such liquidation the General Court may provide for such payment in cash for the first preferred, second preferred, and preferred stock as is "provided in the event of liquidation" in the statutes and "the terms of issue of such preferred stock, or exercise such rights of conversion into common stock as they have, without appeal to any judicial tribunal for a valuation of their shares." These assumptions appear to be made in this question, namely, that liquidation is voted by the stockholders of the Boston Elevated Railway

Company, and that payment in cash or by the exercise of the right of conversion into stock of the new corporation is to be made for the three classes of preferred stock in strict accordance with all preferences established for such classes of preferred stock. We infer from the terms of the proposed bill, to which the question is directed, that this question is intended to apply only to those holders of the several classes of preferred stock who do not assent to the terms of the proposed bill as to taking in exchange for their stock preferred stock in the new company and whose stock is marked "non assenting" under § 6 of the proposed bill. With these assumptions and this interpretation we are of opinion that such an enactment by the General Court would be within its constitutional power. The holders of the several classes of preferred stock cannot complain if they are permitted either to take stock in the new company upon terms deemed fair by the General Court and voted by a majority of the stockholders of the Boston Elevated Railway Company or to receive the amount in cash to which by the terms of issuance of such stock they are entitled upon liquidation and such other preferences as they may be entitled to. The holders of such stock took it upon specific conditions as to their rights in the liquidation of the company. *Treadwell* v. *Salisbury Manuf. Co.* 7 Gray, 393. *Boston & Maine Railroad* v. *Graham,* 179 Mass. 62, 67, 68. *Hale* v. *Cheshire Railroad,* 161 Mass. 443.

We answer "Yes" to question 2A.

In answering this question, we feel constrained to direct attention to this fact: It is required by St. 1911, c. 740, § 2, that upon liquidation of the Boston Elevated Railway Company the holders of the first and second preferred stock "shall be entitled to the payment of the par value of their shares and all accrued and unpaid dividends" before any payment to other shareholders. The rates of dividends are specified in said c. 740, §§ 2, 3. It is to be noted that the proposed bill does not in terms provide for the payment in cash of accrued and unpaid dividends in addition to the specified price per share. See § 6 of this proposed bill, lines 27 to 30 inclusive. It is open to grave doubt whether pay-

ment of accrued and unpaid dividends can be implied from the present bill. .If there are no such dividends, then no difficulty will arise.   This difficulty can easily be avoided.

We answer "Yes" to question 3 of the present order.   The reasons for this opinion are set forth in our answer to question 5 of the order of the Honorable Senate adopted on April 15, 1927, to which reference is respectfully made.

The reasons already stated in answering questions 1 and 2 of the present order are equally applicable to each of the subdivisions of question 4.   It is also within legislative power to enact that the stockholders of the Boston Elevated Railway Company may accept the statute by a majority vote, if a quorum is present.   *Morrill* v. *Little Falls Manuf. Co.* 53 Minn. 371, 377.   *Fowle Memorial Hospital Co.* v. *Nicholson,* 189 N. C. 44.   We answer "Yes" to question 4.

We answer "No" to question 6 of the present order.   The reasons for that conclusion are set forth at length in our answer to question 9 of the order adopted by the Honorable Senate on April 15, 1927, to which reference is respectfully made.

We answer "No" to question 8 of the present order.   The reasons therefor are stated in our answer to question 7 of the order of the Honorable Senate, already mentioned.   Reference is respectfully made to that answer.

We answer "No" to question 9 of the present order for the reasons set forth in the answers to questions 1, 2 and 3 of the order of the Honorable Senate of April 15, 1927, to which reference is respectfully made.

We answer "No" to question 10 of the present order.   For a statement of the reasons for this view, reference is respectfully made to our answers to questions 1, 2 and 3 of the order of the Honorable Senate already described.

Question 11 inquires whether "the joint control for operating and maintaining the Boston Elevated Railway Company, as set forth in said bill, Senate No. 276, [is] repugnant to article 62 of the Amendments to the Constitution of the Commonwealth."   That article of the Amendments forbids the use of the credit of the Commonwealth in aid of "any corporation which is privately owned and

managed." The proposed bill rests upon the theory that while the Boston Elevated Railway Company will continue to be privately owned, it will be under public management and that hence the credit of the Commonwealth may be given in its aid. We assume without discussion that such aid can be granted only in aid of a corporation substantially under the exclusive management of public officers and cannot be granted in aid of one under the joint management of public officers and of those representing, and selected by, private interests. It becomes necessary to examine the terms of this proposed bill to ascertain the nature of the management thereby to be established.

It is provided in said c. 159, § 4, that although the stockholders of the Boston Elevated Railway Company shall elect a board of directors, such board shall, "during the period of public operation, have no control over the management and operation of the street railway system." This provision is not affected or modified in any essential features by the proposed bill, Senate No. 276. In § 3 of that proposed bill is a clause to the effect that no "contracts for the operation or lease of any subways, elevated or surface lines in addition to those now owned, leased or operated by the company, or any extensions thereof beyond their present limits, shall be entered into which shall involve the payment of any rental or other compensation by the company beyond the period of public operation without the consent of the directors of the company," with a further provision to the effect that without such consent no such lines shall be constructed or purchased beyond the limits of existing surface lines after the Commonwealth has elected to discontinue public management. These provisions do not in any essential aspects modify, constrict or control the public management and control of the railway system as a public corporation. Public officers have the exclusive management and control of all existing property of the railway company and the performance of all service for the public. It is only in respect to this narrow field which will affect directly the property of the railway company after its return to private operation that the directors have any power whatever. It

follows that we are unable to perceive in the provisions of said proposed bill, Senate No. 276, especially those in § 3 when read in conjunction with said c. 159 of which it is an amendment, and particularly § 4 thereof, anything which constitutes "joint control for operating and maintaining the Boston Elevated Railway Company" in its vital features as a public corporation. We answer "No" to question 11 of the present order. Reasons for this view also are stated in our answers to questions 1, 2 and 3 in the order of the Honorable Senate already described, to which reference is respectfully made.

We answer "No" to questions 12 and 13 of the present order. The reasons are given in our answers to questions 1, 2 and 3 of said order of the Honorable Senate, to which reference is respectfully made.

Questions 14 to 22, both inclusive, of the present order relate to bill, Senate No. 285. That bill in brief provides for the extension and improvement of transit facilities in Boston, by the construction of two rapid transit routes, the first lying wholly within and the second lying partly within and partly outside of Boston. It confers authority upon the city of Boston acting through its transit department to acquire, lay out and construct that portion of the routes described in the proposed bill lying within the territorial limits of Boston and authority upon the Commonwealth acting through the department of public utilities to acquire, construct and own the portion of the second route lying outside those territorial limits. Both routes are to be leased to the Boston Elevated Railway Company for a term ending on July 1, 1936, at a specified rental. These routes appear to be in part in, over and through existing structures and in part in, over and through new rights of way to be acquired and new structures to be constructed.

The purport of question 14 is whether the General Court has the constitutional power to enact the provisions of this proposed bill for the assessment of all or a specified part of the cost of this public improvement upon the area, which will receive special benefit or advantage beyond the general advantage to the community from such public improvement,

to an amount not in excess of such special benefit or advantage.

The routes to be laid out and constructed under the proposed bill are designed to afford increased accommodations for the public by facilitating the means of travel and transportation. They belong to the same class of public enterprises as highways. They are in substance and effect highways and are governed in the main by the same general principles of constitutional law as are the laying out and construction of highways and bridges. *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 414, 416. So far as concerns the constitutional principles underlying and authorizing the assessment of betterments they are indistinguishable from the laying out, construction and establishment of sewers, sidewalks, parks and kindred public improvements. It has long been the policy of the Commonwealth to provide for raising a part of the funds for the laying out and construction of highways and similar public works by assessment of benefits upon lands receiving special and peculiar benefit therefrom in excess of the general advantage to the entire community. Such assessment cannot lawfully exceed the amount of such special benefit. Such assessments when made in conformity to recognized constitutional limitations have always been upheld. *Dorgan* v. *Boston*, 12 Allen, 223. *Butler* v. *Worcester*, 112 Mass. 541, 555. *Smith* v. *Mayor & Aldermen of Worcester*, 182 Mass. 232. *Sayles* v. *Board of Public Works of Pittsfield*, 222 Mass. 93. *Parsons* v. *Worcester*, 234 Mass. 108. *Briscoe* v. *Commissioners of the District of Columbia*, 221 U. S. 547, 551.

The circumstance that the structures, which are to constitute these routes, are to be leased to a public corporation does not affect the power of the General Court to authorize the levying of an assessment for special benefits flowing from this public enterprise. It has no more effect than the possibility of granting in a highway locations for street railway tracks, or for poles, wires and conduits for telegraph, telephone, electric light and power companies has upon the validity of a betterment assessment for laying out a highway. We think that this point is well settled by the analogy of

numerous decisions. *Sears* v. *Street Commissioners*, 180
Mass. 274, 279. An express adjudication in accordance with
this view is found in *Milheim* v. *Moffat Tunnel Improvement
District*, 262 U. S. 710. We think that the implication of
§ 6 of the proposed bill, Senate No. 285, is that in no event
shall the assessment exceed the special benefit.

We answer "Yes" to question 14.

This proposed bill provides for the determination of the
area receiving such special benefit by commissioners ap-
pointed by the Supreme Judicial Court who are to hold
hearings and whose report when approved by the court shall
be final and conclusive as to all matters included therein.
The General Court has a wide discretion in selecting the
method for determining the amount of the special benefits
arising from public improvements. Various methods have
been adopted in the past as appears from statutes and deci-
sions of this court. The General Court may itself determine
the area benefited by a public improvement. *Smith* v.
*Mayor & Aldermen of Worcester*, 182 Mass. 232. It may
vest jurisdiction to determine the area benefited and the
amount of benefit in established boards of municipal or other
public officers. *Butler* v. *Worcester*, 112 Mass. 541, 555.
*Howe* v. *Cambridge*, 114 Mass. 388. *Sayles* v. *Board of Public
Works of Pittsfield*, 222 Mass. 93. *Houck* v. *Little River Drain-
age District*, 239 U. S. 254, 262. It may authorize the Gover-
nor to appoint a commission. Or it may impose that duty
upon commissioners appointed by the court. Hitherto where
legislation has vested the determination of an assessment in
commissioners appointed by the court, the duty required
has been the apportionment of a burden of general taxation
among municipalities or districts. Assessments of that
nature have been upheld. We are unable to perceive any
difference in constitutional principle between an apportion-
ment of that nature and the assessment required by the
terms of the proposed bill. The principle of strict separation
of legislative, judicial and executive functions enjoined by
article 30 of the Declaration of Rights of the Constitution
does not prevent legislation of this character. That principle
must of course be strictly followed. *Boston* v. *Chelsea*, 212

Mass. 127. But it is not applicable to this branch of the proposed bill.

The requirement of § 6 of the proposed bill that the report of the commissioners when accepted and confirmed by the court shall be final and conclusive presents no constitutional barrier. The court will determine for itself whether the report is extravagant or unreasonable or based upon any error of law and would reject it for such cause. But the court will not revise the judgment of the commissioners or substitute its views of expediency for those of the commissioners. *Weymouth, petitioner,* 251 Mass. 359, 361.

The circumstance that the landowner is given no right to trial by jury as to the betterment does not render the proposed bill unconstitutional. *Chapin* v. *Worcester,* 124 Mass. 464, 468.

We think that affirmative answer is required to question 15 by *Kingman, petitioner,* 153 Mass. 566–579, *De Las Casas, petitioner,* 178 Mass. 213; *S. C.* 180 Mass. 471, *In re Metropolitan Park Commissioners, petitioners,* 209 Mass. 381, 384, 385, *Mayor & Aldermen of Springfield, petitioners,* 234 Mass. 578, 583, *Opinion of the Justices,* 234 Mass. 612, 616, where the pertinent constitutional principles are discussed at large.

The provision of the proposed bill to the effect that the amount of betterments to be assessed shall be apportioned among the several parcels of land in proportion to the valuation of such parcels for purposes of taxation exclusive of buildings reserving to the owners the usual remedies for reduction in valuation does not exceed legislative competency. This question we regard as settled by *Downer* v. *Boston,* 7 Cush. 277, *Springfield* v. *Gay,* 12 Allen, 612, and *Snow* v. *Fitchburg,* 136 Mass. 183. See *Valley Farms Co. of Yonkers* v. *County of Westchester,* 261 U. S. 155, 163.

We answer "Yes" to question 16.

Question 17 raises the point whether, if the routes are to be constructed and the expenses therefor met from the proceeds of bonds, payment of the assessment of betterments may "be spread over the life of the bonds by an annual payment bearing the same relation to the sum required to meet the annual payments for interest and sinking fund upon the

bonds as the amount of benefit to be assessed bears to the cost of the improvement."

The assessment of a betterment arising from a public improvement is a method of taxation. The power of the General Court as to the time of payment of taxes is extensive. Ordinarily taxes must be paid promptly to the end that the expenses of government may be met. But statutes have hitherto been enacted to the effect that such assessment may be made payable in annual instalments over a period of years. See G. L. c. 80, § 13. *Gardner* v. *Boston,* 106 Mass. 549. We are of opinion that such apportionment as is suggested in the question is not unreasonable and is within the constitutional power of the General Court. Difficulties in this connection as to the title to land, preservation of liens, and other matters present questions of legislative expediency rather than constitutional competency. The determination of the amount of annual assessment as set forth in lines 55–76, both inclusive, of § 6 of this proposed bill seems complicated; but so far as we understand those provisions, they involve difficulties of interpretation and application rather than of constitutional power. In principle this point is covered by *Fairbanks* v. *Mayor & Aldermen of Fitchburg,* 132 Mass. 42, 47, 48.

We answer "Yes" to question 17.

The inquiry presented by the first part of question 18 is whether there is constitutional obstacle in the way of the division of the area, receiving special benefits above the general advantage flowing from this public improvement, into zones consisting respectively of land which will receive a more direct and special advantage than the rest of the area and land benefited by more remote means, and the determination by the commissioners of the proportion of the assessment to be levied in each zone. We perceive no constitutional objection in these provisions. They add complications to the always difficult problem of apportionment of betterment assessments. These, however, relate to the practical administration of the proposed bill, if enacted into law, and not to its constitutional aspects. The validity of this method of assessment we think was upheld in prin-

ciple by *Butler* v. *Worcester*, 112 Mass. 541, 556, and *Collins* v. *Mayor & Aldermen of Holyoke*, 146 Mass. 298, 307.

The final branch of question 18 is whether the apportionment of the assessment among the several parcels of land within the respective zones in proportion to valuation for purposes of taxation would be valid. We infer that this means valuation of the land exclusive of buildings, as provided in line 80 of § 6 of this proposed bill.

We are of opinion that this method of apportionment under the circumstances would contravene no provision of the constitution, provided always that such assessment does not exceed the amount of the special benefit conferred upon such parcel by the proposed public improvement. The valuation of land exclusive of buildings for purposes of taxation often has been required by statute as the basis for the assessment of special benefits and has been upheld, as already pointed out.

We answer "Yes" to question 18.

The purport of question 19 is whether it is within the power of the General Court to authorize the additional transportation facilities and equipment, acquired through the use of public credit by issuance of bonds, to be leased to the Boston Elevated Railway Company for a term extending beyond the period of public control at a rental less than interest charges on such bonds and to provide that the balance of such interest charges and sinking fund and serial payments be met from betterment assessments or taxes and that after the maturity of such bonds the rental shall be only such sum as will adequately cover the maintenance and upkeep of the leased property and equipment. This question must be considered in the light of the nature of the Boston Elevated Railway Company as a public service corporation performing functions for the public benefit, and all the existing statutory limitations as to maximum dividends on its stocks and the policy of the Commonwealth touching that particular corporation and similar corporations. The rate of dividends per annum upon the first and second preferred stocks of the Boston Elevated Railway Company is limited by St. 1911, c. 740, §§ 2, 3, to the possible maximum of eight

per cent, upon the preferred stock to seven per cent by Spec. St. 1918, c. 159, § 5, and upon the common stock to six per cent by said c. 159, § 15. We are not advised whether the rate of dividend upon the second preferred stock is seven or eight per cent under St. 1911, c. 740, §§ 2 and 3, but our answer would be the same, whichever it may be. These are the maximum rates of dividend possible after the return of the properties to the corporation at the termination of public management. The rates of fare which can be charged by the corporation after the termination of public management are limited to "such just and reasonable fares as will produce an income sufficient to pay the reasonable cost of the service as defined in section six, including dividends upon the common stock from time to time outstanding of six per cent per annum on the par value thereof but no more." Spec. St. 1918, c. 159, § 15. Thus the maximum income which the Boston Elevated Railway Company may derive from the collection of fares is limited to the amount necessary to meet (1) the cost of the public service rendered as defined by the General Court and (2) dividends upon the several classes of its stock at rates authorized by the General Court. Thus the possible income which the Boston Elevated Railway Company may receive if and when it resumes management of its property is strictly limited by legislative enactment to an amount no more than is reasonable to insure (1) recompense for the actual cost of the service rendered by it to the public and (2) a fair return upon its capital investment. *Bluefield Water Works & Improvement Co.* v. *Public Service Commission of West Virginia,* 262 U. S. 679, 690, 693, 694. The term for which the routes may be leased ending as it does on July 1, 1936, under § 5 of this proposed bill plainly is within the power of the Legislature. Of course the Legislature cannot authorize a gift to a private corporation or divert public funds to private uses. The reduction of rental suggested by the question and provided by this proposed bill in § 5 is not obnoxious to this principle. It is a provision designed in its last analysis to permit a reduction in fares charged to the public. It is not a gift or contribution to a private corporation. The construction of the rapid transit

routes as proposed in this bill is a public enterprise. It may be paid for out of public money. These routes are and are to be and to remain public property. They are in a sense highways for public travel. The rental to be charged therefor is a matter within the legislative power. It has been the custom to grant privileges in public ways for the use of poles and wires and underground pipes and conduits to various public service corporations without charging any rental therefor. It has never been suggested, so far as we are aware, that statutes of this nature transcended the legislative power.

If the General Court deems these provisions of the proposed bill to be in the public interest and for the general welfare, we perceive no constitutional prohibition against their enactment.

We answer "Yes" to question 19.

The reasons stated in answer to question 19, lead us to the conclusion that like answers are required to questions 20 and 21. We accordingly answer each in the affirmative.

The substance of question 23 is whether it is constitutionally competent for the General Court to require the Boston Elevated Railway Company to sell all its property and franchises as a going concern if authorized by the majority in amount of its capital stock, and the Commonwealth to buy, and to authorize the Commonwealth thereupon to sell the same to a new corporation to be incorporated and to be privately owned, with provision that the same may be operated under some scheme of public management. The plan outlined in this question involves an expenditure of public money for the purchase of this railway system from its present owner for the avowed purpose of selling the same to another corporation privately owned. If the Commonwealth buys the property it must pay for the same out of public money. If it sells the same to another corporation it will divest itself of all title and interest in property and transfer the same to the new corporation which is privately owned. It has been decided after great deliberation and with full review of decided cases that the Commonwealth has no power to expend public money for the purpose of acquiring property with the

intention of selling or transferring the whole or any substantial part of the property so acquired to private individuals. We are of opinion that the supposition put in the question brings it within the constitutional prohibitions pointed out and elucidated in *Salisbury Land & Improvement Co.* v. *Commonwealth,* 215 Mass. 371, and *Opinion of the Justices,* 204 Mass. 607; 211 Mass. 624. The vote of the stockholders to sell does not affect this result because the difficulty is not with the power of the owner to sell, but with the power of the Commonwealth to buy with public money. Nor is the result affected by the factor that public management is to be continued or undertaken in a new form. The constitutional obstacles remain that under the assumption contained in the question the Commonwealth is to expend public money to effect a transfer of property privately owned by one corporation and one set of stockholders to another corporation privately owned by another set of stockholders. That is not a public use of public money and is not permissible under the Constitution.

We answer "No" to question 23.

The same reasons just stated in answering question 23 require a negative answer to question 24.

We have answered all the questions thus far specified, although several of them relate to bills pending in the Honorable Senate and not directly pending before the Honorable House of Representatives and which therefore may never reach the Honorable House of Representatives for consideration. There is grave doubt whether an opinion on such matters can rightly be required under the Constitution. The object of the clause of the Constitution touching such opinions, c. 3, art. 2, is "to enable the Senate, the House of Representatives, or the Governor and Council, to obtain the advice of the Justices upon any important question of law which the body making the inquiry has occasion to consider in the exercise of the legislative or executive powers intrusted to them respectively." *Opinion of the Justices,* 122 Mass. 600, 601, 602. *Opinion of the Justices,* 217 Mass. 607, and opinions there reviewed; 148 Mass. 623, 626; 226 Mass. 607, 612. See *Commonwealth* v. *Smith,* 9 Mass. 531. We have

not taken the time to investigate and dispose of the doubt existing on this point, but these answers are not to be regarded as establishing a practice and the question is left open, for future determination, if and when it may arise.

We respectfully ask to be excused from answering questions 5, 7 and 22 of the present order. It has always been the practice of the justices to confine the answers to particular questions of law submitted to them and not to discuss a general inquiry as to the constitutionality of a complicated bill in its entirety. *Opinion of the Justices,* 239 Mass. 606, 612; 247 Mass. 589, 598.

The present order was transmitted to us too late in the session of 1927 to enable us to make adequate answers before the prorogation of the General Court: and this opinion is transmitted before the reassembling of the Honorable House of Representatives.

ARTHUR P. RUGG.
HENRY K. BRALEY.
JOHN C. CROSBY.
EDWARD P. PIERCE.
JAMES B. CARROLL.
WILLIAM C. WAIT.
GEORGE A. SANDERSON.